UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

MOHAMED FEZZANI, et al.,                          :                    99 Civ. 0793 (PAC)

                    Plaintiffs,                   :                    OPINION & ORDER

        - against -                               :

                                                  :

BEAR, STEARNS & COMPANY INC., et al.,             :

                    Defendants.                   :

------------------------------------------------------------X

HONORABLE PAUL A. CROTTY, United States District Judge:

        This action arises out of massive and persistent fraud by a now defunct broker dealer,

A.R. Baron & Co. ("Baron"), which bilked its customers out of millions of dollars during the

four-year period from May 1992, when it opened for business, until it went bankrupt in 1996,

now twelve years ago.  Baron is without assets and its former officers, directors, and key

employees have been found guilty of various crimes.  Plaintiffs, customers of Baron who

allegedly lost more than $7.25 million through Baron's criminal activities, seek recovery from

multiple Defendants which did business with Baron and allegedly propped the company up

during its brief but felonious life, thereby permitting Baron to continue its criminal conduct.

Plaintiffs seek recovery on six causes of action:  (1) federal securities fraud based on the

defendants' misrepresentations and omissions; (2) federal securities fraud based on market

manipulation; (3) violations of the Racketeer Influenced and Corrupt Organizations Act

("RICO"); (4) common law fraud; (5) civil conspiracy to defraud; (6) and aiding and abetting

fraud.  Defendants move to dismiss the complaint.  For the reasons that follow, the motions are GRANTED as to all defendants, expect the Apollo Defendants' motion is DENIED.

## I.  BACKGROUND

### A.  Brief History of Baron

During its operation from 1992 to 1996, Baron was the prototypical "boiler room" securities broker.[1]  Baron's general scheme was to manipulate the price of specific securities by taking small, unknown companies with negligible profits and little overhead and then raising funds through an initial public offering ("IPO").  At the IPO stage, Baron would sell shares of the offering company to a small group of trusted investors.  Baron would create a market for these shares through cold-calls to potential customers and high-pressure sales tactics.  Baron brokers would suppress negative information about the stocks, while inflating any positive information.  There was relatively little public information available to buyers because the companies that Baron brokers promoted were so small.  Baron brokers were therefore able to control the information to customers and create a market for the stocks where none actually existed.  Thus, Baron brokers could artificially inflate prices of the stocks.

The Baron scheme was reliant on presenting an impression that the stocks it sold were part of an active and vibrant market.  When Baron brokers were unable to create sufficient demand for their stocks, Baron brokers executed unauthorized transactions on behalf of clients or used fictitious purchases to create an appearance of an active market.  One such manipulation was "parking" a stock, which meant executing a trade to a buyer who was actually an insider. The stock would be parked in the insider's account to create the appearance of active trading, but Baron retained the risk of loss in the stock price.  The point of the various stock manipulations

---

[1]     Baron's history is described in Plaintiffs' First Amended Complaint for Securities Fraud, Market Manipulation, RICO and Common Law Claims ("Pl.'s First Am. Compl.").  References to Baron's history are culled from this complaint, but for purposes of brevity the Court will not cite every reference in this section.

was to drive the price up so that Baron and its co-conspirators could cash out their holdings before the stock crashed.

Baron eventually became a victim of its scheme.  The company was under pressure to bring in enormous amounts of capital to prop up the IPOs that it had backed and to cover the repeated unauthorized purchases of stock that it made to create an appearance of an active trading market.  By the end of 1995, Baron had a net capital deficiency of more than $1 million, and customer complaints amounted to approximately $80 million.  Baron had gone out of business temporarily in both 1993 and in October 1995, and in July 1996 Baron filed for bankruptcy.

### B.  History of the Case

#### i.  The Original Complaint

Unlike Baron's short-lived business, this case has enjoyed a long lifespan.  Plaintiffs filed their first complaint in February 1999,[2] alleging six claims against multiple parties which did business with Baron.  Plaintiffs' claims included:  (1) violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and its implementing regulation, Rule 10b-5, 17 C.F.R. § 240.10b-5, through fraudulent misrepresentations and omissions in the sale of securities; (2) violations of Section 9 of the Securities Exchange Act, 15 U.S.C. § 78i, through knowing or reckless manipulation of the securities traded on the national securities exchanges; (3) violations of Section 10(b) and Rule 10b-5 based on market manipulation; (4) claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962; (5) a claim of aiding and abetting a violation of fiduciary duties under New York State law; and (6) a claim of common-law fraud under New York State law.

---

[2]    This case was initially assigned to Judge Richard Conway Casey.  Upon his death, the case was reassigned to this Court.

The original complaint named eleven individuals or organizations that allege they were defrauded into purchasing stock by Baron's manipulation and now claim that Defendants are liable for their losses.[3]  The Defendants in the original complaint included a hodgepodge of companies and individuals who are alleged to have assisted and profited from Baron's fraud:  a group of Baron executives and employees ("Baron Defendants");[4] Bear, Stearns & Co., Bear Stearns Securities Corp., and Richard Harriton ("Bear Stearns Defendants");[5] Donald & Co., First Hanover Securities, and Fahnestock & Co. ("Broker Defendants");[6] a group of individual defendants who were alleged to have provided financing to Baron and were thus part of the fraudulent scheme ("Individual Defendants");[7] and Apollo Equities, Barry Gesser, and Michael Ryder ("Apollo Defendants").[8]

### ii.  The First Motion to Dismiss

Defendants moved to dismiss all of Plaintiffs' claims in August 1999 and Judge Casey granted the motions in part and denied them in part. See Fezzani v. Bear, Stearns & Co., 384 F. Supp. 2d 618, 624 (S.D.N.Y. 2004) ("Fezzani I").  Specifically, he found that all securities claims based on activities prior to February 2, 1996, three years before the complaint was filed,

---

[3]     The named Plaintiffs in the complaint were:  Mohamed Fezzani, The Cirenaca Foundation, Lester Blank, Dr. Victoria Blank, James H. Bailey, Jane Bailey, Baydel Ltd., Margaret Burgess, Patrick Burgess, The Bootlesville Trust, and Adam Cung.

[4]     The individual Baron employees were Andrew Bressman, Arthur Bressman, Richard Acosta, Glenn O'Hare, Joseph Scanni, Brett Hirsch, Garvey Fox, Matthew Ricci, Richard Simone, Charles Plaia, Mark Goldman, John McAndris, Jack Wolynez, and Robert Gilbert.  Andrew Bressman was Baron's President and Chief Executive Officer; he pled guilty in state court to enterprise corruption and grand larceny.  Arthur Bressman is Andrew's father.  All of the other Baron Defendants were Baron brokers who have since been convicted of state crimes.  Of all the Baron Defendants, only Acosta appeared in the original case. See Fezzani v. Bear, Stearns & Co., 384 F. Supp. 2d 618, 627 (S.D.N.Y. 2004) ("Fezzani I").

[5]     Bear, Stearns & Co. was alleged to have acted as the clearing house for Baron's trades for some of the relevant period.  Harriton was a senior director of Bear Stearns Securities Corp.

[6]     The Broker Defendants were alleged to have assisted in the parking and other fictitious transactions.

[7]     The named Individual Defendants were Fozie Farkash, Rawai Raes, Basil Shablaq, Ken Stokes, Isaac R. Dweck, Individually and as custodian for Nathan Dweck, Barbara Dweck, Morris I. Dweck, Ralph I. Dweck, Millo Dweck, Beatrice Dweck, Richard Dweck, Jack Dweck, Issac B. Dweck, Hank Dweck, Morris Wolfson, Arielle Wolfson, Aaron Wolfson, Abraham Wolfson, Tovie Wolfson, Anderer Associates, Boston Partners, Wolfson Equities, Turner Scharer, Chana Sasha Foundation, United Congregation Mesarah.

[8]     The Apollo Defendants were alleged to have paid bribes to Baron in exchange for Baron brokers recommending that clients purchase certain securities.

were time-barred. Id. at 637.  Accordingly, the claims set forth in the first three causes of action by Plaintiffs Fezzani, Cirenaca, Jane Bailey, the Blanks, Baydel, Bootlesville, and Cung were dismissed as time barred, leaving only the unbarred claims of the remaining plaintiffs—James Bailey and the Burgesses ("Remaining Plaintiffs"). Id.

As to the Remaining Plaintiffs' first three causes of action (the securities-law claims), Judge Casey dismissed the three causes of action against the Bear Stearns defendants for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). Id. at 640-42.  He dismissed the Remaining Plaintiffs' second cause of action alleging violation of Section 9 of the Securities Exchange Act as to all defendants for failure to state a claim. Id. at 641.  On the Remaining Plaintiffs' first cause of action (a violation of Section 10(b) and Rule 10b-5 of the Securities Exchange Act for misrepresentations and omissions) against the Individual and Broker Defendants, Judge Casey dismissed that cause for failure to state a claim. Id. at 643.

The Remaining Plaintiffs' third claim (Section 10(b) and 10b-5 market manipulation violations) against the Broker Defendants was dismissed for failure to plead with particularity under Federal Rule of Civil Procedure 9(b), with leave to replead. Id.  The Remaining Plaintiffs' third claim against Individual Defendants was dismissed for failure to state a claim (James Bailey) and dismissed for failure to plead with particularity, with leave to replead (Burgesses). Id.

Judge Casey also dismissed the Remaining Plaintiffs' first cause of action against the Apollo Defendants for failure to state a claim. Id. at 645.  He also dismissed the fifth claim (aiding and abetting breach of fiduciary duty) against all defendants for failure to state a claim, except for James Bailey's claims against Apollo Defendants. Id. at 647.

Plaintiffs' original pleading was left with the following viable claims:

(1)     RICO claims against the Baron Defendants;

(2)     The federal securities claim against Arthur Bressman;

(3)     James Bailey's third cause of action based on market manipulation against the Apollo Defendants; and

(4)     Bailey's aiding and abetting breach of fiduciary duty claim against the Apollo Defendants. Id. at 649.

Additionally, Judge Casey granted the Remaining Plaintiffs leave to replead their third cause of action against the Broker Defendants and gave the Burgesses leave to replead their third cause of action against the Individual Defendants.  Id.

### iii.   The Motion for Reconsideration and Re-Filing of the Complaint

Plaintiffs moved for reconsideration of Judge Casey's decision on two issues.  First, they argued that the Court should have applied a six-year statute of limitations to their state-law claim for aiding and abetting breach of fiduciary duty. See Fezzani v. Bear, Stearns & Co., No. 99 Civ. 0793 (RCC), 2004 WL 1781148, at *1 (S.D.N.Y. Aug. 10, 2004) ("Fezzani II").  Judge Casey rejected that argument, holding that the New York statute of limitations for breach of fiduciary duty when monetary damages were sought was three years. Id. at *2-3.  Second, plaintiffs argued that they should have been given an opportunity to replead their pre-1996 claims for common-law fraud. Id. at *3.  The court agreed and allowed the plaintiffs leave to replead the common-law fraud claims, but not those based on unauthorized trades. Id.  The Court also added that "plaintiffs may be able to state a claim for civil conspiracy" (emphasis in original).  Judge Casey expressly declined to comment on whether the conspiracy claim would be viable, if and when alleged. Id.

Plaintiffs filed an amended complaint in September 2004.  The original amended complaint included several claims which, defendants contended, went beyond the limited repleading allowed by Judge Casey's first order. See Fezzani v. Bear, Stearns & Co., No. 99 Civ. 0793 (RCC), 2005 WL 500377, at *1 (S.D.N.Y. Mar. 2, 2005) ("Fezzani III").  Specifically, the proposed amended complaint included:  (1) a new 10b-5 claim by certain plaintiffs against certain defendants; (2) a new RICO claim which would only be used if the securities claims failed; (3) a claim for aiding and abetting breach of fiduciary duty against certain defendants; and (4) a new cause of action for aiding and abetting common-law fraud. Id.

Judge Casey held that leave to amend the RICO claim would be futile.  He also found that the new 10b-5 claim and the claims for aiding and abetting breach of fiduciary duty based on pre-February 1996 actions were time-barred, and, thus, they too would be futile. Id. at *3-6.  In other respects, the court granted the motion to amend the complaint, and upon its filing, Judge Casey invited a new round of motions to dismiss. Id. at *9.

### iv.  The Amended Complaint

Plaintiffs filed their first Amended Complaint on April 7, 2005.  It is not so much a pleading as it is a novelette, 113 pages long with 357 separately numbered paragraphs.  It layers allegations of various kinds, involving different transactions, accusing multiple actors, performing different functions, of culpable behavior.  It is far heavier on broad conclusions than it is on specific allegations of fraudulent behavior.  The amended complaint is at the polar opposite of the "short and plain statement" of a claim for relief envisioned by the Federal Rules of Civil Procedure. See Fed. R. Civ. P. 8(a)(1).

The first amended complaint alleges six causes of action:  two for securities fraud under Section 10(b) and Rule 10b-5 (misrepresentations and omissions, as well as market

manipulation); one for RICO violations; one for common-law fraud; one for civil conspiracy to commit fraud, and one for aiding and abetting fraud.  The Plaintiffs dropped their claim based on Section 9 of the Securities Exchange Act.  The only new theory of recovery, predictably in view of Judge Casey's comments in <u>Fezzani II</u>, 2004 WL 1781148, at *3, was the civil conspiracy to commit a fraud.

The Defendants in the Amended Complaint include all the previously named defendants, broken into six groups:[9]  (1) the Baron Defendants; (2) the Bear, Stearns Defendants; (3) the Broker Defendants;[10] (4) the Dweck Defendants (Isaac R. Dweck, individually and as custodian for Nathan, Barbara, Morris, Ralph, Millo, Beatrice, Richard, Isaac B., and Hank Dweck);[11] (5) the Wolfson Defendants (Morris, Arielle, Aaron, Abraham, Tovie Wolfson, Anderer Associates, Boston Partners, Wolfson Equities, Chana Sasha Foundation, United Congregation Mesarah); and (6) the Apollo Defendants, plus one individual defendant, Ken Stokes.[12]

Additionally, the various causes of action apply differently to each Defendant.  The first claim (securities fraud for misrepresentations and omissions) is applicable to all Defendants, except the Wolfson Defendants and the Apollo Defendants. (<u>See</u> Pl.'s First Am. Compl. 102.) The second and third claims (securities fraud for market manipulation and RICO) are leveled against all defendants except the Wolfson Defendants.[13] (<u>Id.</u> 106, 107.)  The fourth claim

---

[9]    The defendant groupings have remained the same from the original complaint to the First Amended Complaint, except where the Court specifies by naming the particular defendants in each grouping.  The named Plaintiffs also remain the same from the original complaint.

[10]    Defendant Donald & Co. has ceased operations and was voluntarily dismissed.

[11]    By stipulation dated December 27, 2006, Plaintiffs agreed to dismiss with prejudice the claims against Isaac B. Dweck, Richard Dweck and Hank Dweck.

[12]    Defendant Stokes has not appeared in this case.

[13]    While the heading of the third claim for RICO violations in the complaint does not specifically exclude any defendant other than the Wolfson Defendants, Plaintiffs acknowledged at oral argument that the RICO claim applies only to the Baron defendants other than Arthur Bressman. (<u>See</u> Hr'g On Mot. To Dismiss Tr., October 23, 2007, 14:15-18 (excluding Bear Stearns Defendants); 48:1-25, 49:1-20 (excluding all parties and Arthur Bressman other than Baron Defendants)).  As the Baron Defendants (other than Arthur Bressman) have defaulted in this case, the Court will not consider the RICO claim against the remaining defendants.

(common law fraud) applies to only the Bear Stearns Defendants and the Baron Defendants. (Id. 111.)  The fifth and sixth claims apply to all defendants without exception. (Id. 111, 112.)

As Judge Casey anticipated, Defendants again moved to dismiss, urging that Plaintiffs failed to state a claim, raised time-barred claims, and failed to plead with the required particularity.  The motions were fully briefed by August 9, 2005, and were argued in front of Judge Casey on October 11, 2005.  They were undecided at the time of Judge Casey's death. Upon reassignment to this Court, the parties were given an opportunity to freshen their briefs on the pending motion to dismiss.[14]  Oral argument was heard on October 23, 2007.

## II.  Discussion

### A.  Motion to Dismiss Standard

The Defendants have moved to dismiss the complaint.  On a motion to dismiss, the Court must accept as true the factual allegations in the complaint, and must draw all inferences in the plaintiff's favor.  See Allaire Corp. v. Okumus, 433 F.3d 248, 249-50 (2d Cir. 2006).  To survive dismissal, a complaint must plead enough facts to be plausible on its face.  Ruotolo v. City of New York, 514 F.3d 184, 188 (2d Cir. 2008) (citing Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1974 (2007)).  The Court may dismiss a claim where it "appears beyond doubt" that the plaintiff can prove no facts that would entitle him to relief.  Allen v. WestPoint-Pepperell, Inc., 945 F.2d 40, 44 (2d Cir. 1991) (citation omitted).

---

[14]        In a letter dated September 20, 2007, written in response to the Court's invitation to the parties to freshen their briefs, Plaintiffs urge the Court to allow them to file an additional claim of aiding and abetting breach of fiduciary duty for acts that occurred after February 1, 1993.  Plaintiffs argue that Judge Casey misapplied the statute of limitations in both Fezzani I and Fezzani II when he restricted the claim to acts that occurred after February 1, 1996.  See Fezzani I, 384 F. Supp. 2d at 646-47; Fezzani II, 2004 WL 1781148, at *2-3.  Plaintiffs argue that New York law recognizes a six-year statute of limitations on claims for aiding and abetting breach of fiduciary duty, rather than a three-year period as Judge Casey found.  Even though Judge Casey ruled in Fezzani I that some of the claims for aiding and abetting breach of fiduciary duty could survive the motions to dismiss, Plaintiffs still elected not to replead those claims in their First Amended Complaint.  As Plaintiffs have not chosen to bring a claim for aiding and abetting breach of fiduciary duty for the non time-barred claims, the Court sees no reason to rule on whether Plaintiff should be able to expand its hypothetical claim over a longer time period.

**B. Rule 9(b) and the PSLRA**

While Rule 8(a) of the Federal Rules of Civil Procedure sets forth minimum pleading requirements, allegations of securities fraud violations made under sections 10(b) and 10(b)(5) of the Securities Exchange Act must also meet the heightened pleading standards of Rule 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), codified at 15 U.S.C. § 78u-4(b). Rule 9(b) requires that a party alleging fraud state "with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b).

A plaintiff in a securities fraud suit must also comply with the exacting pleading requirements of the PSLRA, enacted by Congress in 1995 "[i]n order to curtail the filing of meritless lawsuits." Novak v. Kasaks, 216 F.3d 300, 306 (2d Cir. 2000) (internal quotations and citations omitted). In addition to other requirements, the PSLRA requires "plaintiffs to state with particularity both the facts constituting the alleged [securities fraud] violation" and the other elements of the 10(b) cause of action. Tellabs, Inc., v. Makor Issues & Rights, Ltd., 127 S. Ct. 2499, 2504 (2007). In order to follow Congress' intent to eliminate baseless lawsuits through the application of rigorous pleading standards, the PSLRA mandates that a plaintiff alleging a section 10(b) action must: (1) specify each statement alleged to have been misleading and the reason or reasons why the statement is misleading, and (2) state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind. 15 U.S.C. § 78u-4(b)(1) and (2).

**C. The Elements of the Causes of Action Alleged in the Amended Complaint**

**i. Section 10(b) and Rule 10b-5**

Section 10(b) of the Securities Exchange Act prohibits the use of any "manipulative or deceptive device" in connection with the sale of a security. 15 U.S.C. § 78j(b). Rule 10b-5

prohibits any person from making "any untrue statement of a material fact or to omit a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security."  17 C.F.R. § 240.10b-5.  The rule also makes it unlawful to "engage in any, act, practice, or course of business which operates or would operate as a fraud or deceit upon any person . . . in connection with the purchase or sale of any security." Id.  Essentially, Rule 10b-5 prohibits any misrepresentation that causes "reasonable investors to rely thereon, and . . . cause them to purchase or sell a corporation's securities." Azrielli v. Cohen Law Offices, 21 F.3d 512, 517 (2d Cir. 1994).

To state a claim for relief for fraudulent misrepresentation or omission under section 10(b) and Rule 10b-5, plaintiffs must allege that "in connection with the purchase or sale of securities, the defendant[s], acting with scienter, made a false material representation or omitted to disclose material information and that the plaintiff[s'] reliance on defendant's action caused [the plaintiff] injury." Edison Fund v. Cogent Inv. Strategies Fund, Ltd., 551 F. Supp. 2d 210, 220 (S.D.N.Y. 2008) (internal quotations and citations omitted).

To state a claim for market manipulation, a plaintiff must allege:  "(1) damage, (2) caused by reliance on defendants' misrepresentations or omissions of material fact, or on a scheme by the defendants to defraud, (3) scienter, (4) in connection with the purchase or sale of securities, (5) furthered by the defendants' use of the mails or any facility of a national securities exchange." Schnell v. Conseco, Inc., 43 F. Supp. 2d 438, 448 (S.D.N.Y. 1999).

### ii.  Common Law Fraud

To state a claim for fraud under New York law, a plaintiff must allege "a material, false representation, an intent to defraud thereby, and reasonable reliance on the representation,

causing damage to the plaintiff." May Dept. Stores Co. v. Int'l Leasing Corp., Inc., 1 F.3d 138, 141 (2d Cir. 1993). Where a party alleges market manipulation as part of its common-law fraud claim, "the reliance element may be satisfied by averment that the plaintiff relied on the integrity of the market." Scone Invs., L.P. v. Am. Third Mkt. Corp., No. 97 Civ. 3802 (SAS), 1998 WL 205338, at *10 (S.D.N.Y. April 28, 1998). Courts in the Second Circuit have found that the "elements of common law fraud are essentially the same as those which must be pleaded to establish a claim under § 10(b) and Rule 10b-5." Id.; see also Pits, Ltd. v. Am. Express Bank Int'l, 911 F. Supp 710, 719 (S.D.N.Y. 1996).

### iii. Civil Conspiracy to Defraud

While New York law does not contain an actionable tort of conspiracy alone, a plaintiff may still plead the tort of civil conspiracy "in order to connect someone to an otherwise actionable tort committed by another and establish that those actions were part of a common scheme." Lewis v. Rosenfeld, 138 F. Supp. 2d 466, 479 (S.D.N.Y. 2001). Thus, to state a claim for conspiracy a plaintiff must allege both a primary tort and also show the four elements of a conspiracy, namely: "(1) a corrupt agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3) the parties' intentional participation in the furtherance of a plan or purpose; and (4) resulting damage or injury." Best Cellars Inc. v. Grape Finds at Dupont, Inc., 90 F. Supp. 2d 431, 446 (S.D.N.Y. 2000).

### iv. Aiding and Abetting Fraud

Under New York law, the elements of a claim for aiding and abetting fraud are: "(1) a violation by the primary wrongdoer, (2) knowledge of the wrongful conduct by the aider and abettor, and (3) substantial assistance by the aider and abettor in achieving the violation." OSRecovery, Inc. v. One Groupe Int'l., Inc., 354 F. Supp. 2d 357, 377 (S.D.N.Y. 2005). The

"substantial assistance" requirement of the third prong exists "where a defendant affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables the fraud to proceed." Cromer Fin. Ltd. v. Berger, 137 F. Supp. 2d 452, 470 (S.D.N.Y. 2001) (internal quotations and citation omitted).  The actions of the abettor must also proximately cause the harm to satisfy the "substantial assistance" prong. See McDaniel v. Bear Stearns & Co., 196 F. Supp. 2d 343, 352 (S.D.N.Y. 2002).  Where a defendant owes no fiduciary duty to a plaintiff, mere inaction by the defendant cannot constitute actionable participation in the aiding and abetting claim. Cromer, 137 F. Supp. 2d at 470.  Indeed, if the defendant has no such fiduciary duty, "the scienter requirement scales upward—the assistance rendered should be both substantial and knowing." Ross v. Bolton, 639 F. Supp. 323, 327 (S.D.N.Y. 1986).

### D.  The Sufficiency of the Amended Complaint

The First Amended Complaint details, as did the original complaint, the wrongdoing of Baron and its conduct during its brief and felonious life.  Undoubtedly, Baron and its officers and employees caused substantial damage to their securities customers.  The reality is, however, that Baron was bankrupt and its officers and key employees incarcerated when the original action was filed in 1999.  In their quest for further relief, plaintiffs shift targets, alleging that "this case is not only about Baron . . . but it also names those who conspired with Baron to assist it in the frauds." (Pl.'s First Am. Compl. ¶ 5.)  Plaintiffs allege that "defendants have pursued a common course of conduct and have acted in concert with, and conspired with, one another in furtherance of their common plan, scheme or design to create a price 'mirage' and the fake appearance of an active bona fide liquid market." (Id. ¶ 6.)  Bear Stearns sent "deceptive sales confirmations and monthly statements which were designed to and did deceive plaintiffs into believing that the Manipulated Securities were trading at bona fide prices . . ." on a valid, fair, and liquid market.

(Id. ¶ 7.)  The Broker Defendants (Donald & Co., First Hanover Securities, Inc., and Fahnestock

& Co.) "knowingly engaged in 'parking' . . . transactions with the purpose and effect of creating

an artificial appearance of an active trading market." (Id. ¶ 9.)  Plaintiffs also allege that the

Dwecks and Wolfsons engaged in similar parking transactions with the purpose and effect of

creating a false appearance.  Additionally, Isaac Dweck "provided short-term financing and was

effectively Baron's banker." (Id. ¶ 10.)  The Apollo Defendants "paid bribes . . . to Baron" to

facilitate the sales of Jockey Club and U.S. Bridge Securities. (Id. ¶ 11.)

      The sum of the revised allegations is that not much has changed from the original

complaint to the first amended complaint.  For example, paragraph 84 of the original complaint

reads as follows:

> Even for a firm of Bear Stearns rather flexible sense of business
> morality, taking on a Baron must have seemed quite a stretch.
> Baron's owners were 28 year old's who had spent their entire,
> albeit limited, careers selling millions of dollars of only two
> grossly overvalued stock, at Blair.  Blair's unsavory reputation on
> the street was well known to Bear Stearns.  Neither Weissman nor
> Bressman had any experience running a brokerage firm or any
> other business.  Both Weissman and Bressman, and, indeed, many
> of their initial employees, had numerous customer complaints on
> their records, including many for unauthorized purchases and/or
> refusals to sell, which are hallmarks of manipulation.

      The First Amended Complaint has essentially the same allegation in an embellished

form:

> Harriton and Bressman were close personal friends who met
> regularly and who socialized both before and after the clearing
> relationship between Baron and Bear Stearns.  Even for a firm of
> Bear Stearns' history of knowingly clearing for illegally operated
> boiler room operations, taking on Baron must have still seemed
> quite a stretch at least from a business point-of-view.  Baron's
> owners were 28 year old's who had spent their entire, albeit
> limited, careers selling millions of dollars of only two grossly
> overvalued stock, at Blair.  Blair's unsavory reputation on the
> street was well known to Bear Stearns (although Harriton

apparently had a personal relationship with Blair's owner, Morty Davis). Neither Weissman nor Bressman had any experience running a brokerage firm or any other business. Both Weissman and Bressman, and, indeed, many of their initial employees, had numerous customer complaints on their records, including many for unauthorized purchases and/or refusals to sell, which are hallmarks of manipulation and potentially expose both the introducing broker and the clearing broker to substantial losses.

(Pl.'s First Am. Compl. ¶ 93.) The embellishments fall considerably short of making up the pleading deficiencies that Judge Casey found. See, generally, Fezzani I, 384 F. Supp. 2d 618. The Court will now turn to an analysis of why the First Amended Complaint still does not state a claim or satisfy pleading requirements as to all but one of the defendants.

### i. The Bear Stearns Allegations

Plaintiffs have alleged certain new matters against Bear Stearns. For example, plaintiffs state that Bear Stearns intervened with the National Association of Securities Dealers ("NASD") on Baron's behalf (Pl.'s First Am. Compl. ¶ 172); lent money to Baron (id. ¶ 229); and asked Baron about certain customer complaints (id. ¶ 239). Notwithstanding the additions and embellishments, the gravamen of the wrongs alleged against Bear Stearns do not change: it knew of Baron's frauds, and yet continued to process trades, issue confirmations, and provide monthly reports. Had it only reported what it knew or should have known, plaintiffs allege, Baron's fraudulent and felonious conduct toward the complainants would have ceased.

The core allegations are the same ones that Judge Casey previously dismissed. See, generally, Fezzani I, 384 F. Supp. 2d 618. Bear Stearns functioned as a clearing broker for Baron's, the introducing broker. Judge Casey recognized that the roles of the clearing broker and introducing broker are separate and distinct. Pursuant to the rules of the Securities and Exchange Commission ("SEC"), the clearing broker does not supervise—and is not responsible for—the sales practices of the introducing broker. The introducing broker is responsible for its

own sales practices, and responsibility cannot be transferred to or imposed upon the clearing broker. <u>See</u> SEC Rules 405 and 382; Order Approving NYSE Proposed Rule Change, Exchange Act Release No. 18497 (Feb. 19, 1982), 47 Fed. Reg. 8, 284 (Feb. 25, 1982).  Judge Casey recognized that federal courts have acknowledged the distinction and have not imposed liability on the clearing broker for the transgressions or misbehavior of the introducing broker. <u>See</u> <u>Dietrich v. Bauer</u>, 76 F. Supp. 2d 312 (S.D.N.Y. 1999); <u>Connolly v. Havens</u>, 763 F. Supp. 6 (S.D.N.Y. 1991).

Plaintiffs point out a change in the case law which supported Judge Casey's holding that the three-year statute of limitation cut off any alleged wrongdoing prior to February 2, 1996.  <u>In re WorldCom Securities Litigation</u>, 496 F. 3d 245 (2d Cir. 2007), held that the tolling required by <u>American Pipe & Construction Co. v. Utah</u>, 414 U.S. 538 (1974), for class members on whose behalf a class action is filed applies with like force to class members who file individual suits before class certification is resolved.  Since some of the plaintiffs here were also class members in <u>Berwecky v. Bear Stearns & Co.</u>, 197 F.R.D. 65 (S.D.N.Y. 2000), the appropriate limitation period was not February 2, 1996, but rather July 21, 1994.[15]

Even though the <u>WorldCom</u> case increases Bear Stearns' period of exposure, the decision does not cast Bear Stearns into liability for the other reasons given in Judge Casey's <u>Fezzani I</u> decision.  Moreover, there are other new decisions which confirm the correctness of Judge Casey's ruling.  In <u>Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.</u>, the Court confirmed that absent a duty to disclose, there can be no liability for omissions or misrepresentations. 128 S. Ct. 761, 769 (2008) (finding that defendants had no duty to disclose and thus were not liable to customers of a collaborating co-defendant for misstatements).  As

---

[15]    <u>Berwecky</u> was filed on July 21, 1997, thus placing the activities of defendants three years prior to that filing into the relevant time period for this action.

Judge Casey previously noted, a clearing broker has no duty of disclosure to customers of introducing brokers. See Fezzani I, 384 F. Supp. 2d at 641.  Thus, Plaintiffs' new allegations do not change the controlling analysis—without a duty to disclose, the Bear Stearns Defendants cannot be liable under section 10(b) and Rule 10b-5 for misrepresentations or omissions.

As to allegations of market manipulation (the second cause of action against Bear Stearns), Judge Casey previously dismissed this cause of action for failure to state a claim.  He distinguished between mere clearing conduct (which there is no doubt Bear Stearns performed, perhaps even with knowledge of Baron's conduct) and primary wrongdoing where Bear Stearns engaged in directed conduct with scienter to affect the prices of securities. Id. at 641-42.

While there are new allegations concerning Bear Stearns (e.g., lending funds (Pl.'s First Am. Compl. ¶ 229); taking an assignment of claims (id. ¶ 191)), they suggest only that Bear Stearns was taking legitimate business steps to protect its own credit position vis-à-vis Baron's. They do not suggest that Bear Stearns crossed the line and began to initiate, direct, and participate in Baron's fraudulent schemes.  The revised 10(b) and 10b-5 market manipulation allegations in the First Amended Complaint do not cure the deficiencies that Judge Casey found in his dismissal of this claim.  The second claim against the Bear Stearns Defendants is dismissed.

Both the first and second claims against Bear Stearns must also be dismissed because scienter is inadequately pled. In Tellabs v. Makor Issues & Rights Ltd., 127 S. Ct. 2499 (2007), the Court held that a plaintiff can only meet the PSLRA pleading standard by alleging facts that permit an inference of fraudulent intent that is cogent and at least as compelling as any non-culpable inferences. 127 S. Ct. at 2510.  Here, the First Amended Complaint does not meet the Tellabs standard.  All of the alleged wrongful conduct by Bear Stearns is just as readily

explained as normal commercial conduct undertaken by a clearing broker to protect its own economic intent.  This is well short of establishing Bear Stearns' fraudulent intent with respect to plaintiffs.

As to the state-law claim of common-law fraud, aiding and abetting fraud, and conspiracy to commit a fraud, each of those claims must fail as well.

The common-law fraud claim is essentially the same as the 10(b) fraud claim which has already been rejected.  Since the pleading standards for Section 10(b) and Rule 10b-5 claims are the same as common-law fraud standards, it follows that if one is dismissed, the other should be as well. See Vandenberg v. Adler, 98 Civ. 3544 (WHP), 2000 WL 342718, at *12 (S.D.N.Y. March 31, 2000).

With respect to aiding and abetting, any claim here must recognize that Bear Stearns functioned as a clearing broker.  As a matter of law, clearing brokers are not responsible or liable for the fraudulent sales practices of the introducing broker. Greenberg v. Bear, Stearns & Co., 220 F.3d 22, 29 (2d Cir. 2000).  Since there is no duty, the plaintiffs must demonstrate that Bear Stearns crossed the line and acted with intent to defraud. Bolton, 904 F.2d at 824.  As previously indicated, the specific acts alleged here—that Bear Stearns intervened with the NASD on Baron's behalf, extended credit and the like—cannot cast Bear Stearns into liability because they are the type and kind of ordinary business activity of the clearing broker.  The First Amended Complaint's allegations of substantial assistance do not go beyond the ordinary services rendered by a clearing firm.  This cause of action is dismissed for failure to state a claim.

Plaintiffs' final allegation, conspiracy to commit fraud, was not in the original complaint. Under New York law, there is no claim for civil conspiracy. Rosenfeld, 138 F. Supp. 2d at 479. The alleged conspiracy must connect the actions of separate defendants with an otherwise

actionable tort. Id.  The tort here is clearly for fraud.  One of the four elements that plaintiffs

must show to allege a conspiracy is that Bear Stearns took an overt act in furtherance of the

conspiracy. Best Cellars Inc., 90 F. Supp. 2d 446.  For the reasons previously mentioned, Bear

Stearns' alleged actions are not unlawful, nor are they fraudulent.  Each of its alleged acts was

undertaken in Bear Stearns' own interest as the clearing broker.  Baron intended to defraud its

customers, but Bear Stearns intended only to engage in lawful activity as a clearing broker,

taking such steps necessary to protect itself.  Thus, the cause of action for civil conspiracy to

commit fraud is dismissed for failure to state a claim.

### ii.  Allegations Against the Broker Defendants

As compared to the many allegations of wrongdoing against the Bear Stearns Defendants,

the First Amended Complaint contains significantly fewer specific claims of improper behavior

by the Broker Defendants.  The Broker Defendants are alleged to have helped create an

appearance of an active trading market for Baron's securities by using their own accounts to

"park" Baron securities. (See Pl.'s First Am. Compl. ¶¶ 268, 269, 277.)  Additionally, the First

Amended Complaint alleges broadly that the Broker Defendants reaped a profit from the parking

arrangement (Id. ¶ 270).  The essence of the allegations against the Broker Defendants is that

without their participation in the fraudulent parking scheme, the value of the Baron securities

would not have been artificially inflated and would not have been as attractive to the Plaintiffs.

The First Amended Complaint includes the Broker Defendants in the first, second, fifth

and sixth claims.  Some of these claims, however, have already been dismissed by Judge Casey

for failure to state a claim.

On the first claim, misrepresentations or omissions under Section 10(b) or Rule 10b-5,

Judge Casey ruled in Fezzani I that the claim was dismissed without leave to replead against the

Broker Defendants. 384 F. Supp. 2d at 643.  Even if Judge Casey had not precluded Plaintiffs from repleading this claim, Plaintiffs have failed to plead the allegations with the level of particularity required by Rule 9(b).  Under Rule 9(b), claims of misrepresentation must "adequately specify the statements that were false or misleading, give particulars as to the respect in which it is contended that the statements were fraudulent, and state the time and place the statements were made and the identity of the person who made them." In re Blech Sec. Litig., 928 F. Supp. 1279, 1291 (S.D.N.Y. 1996) (citing McLaughlin v. Anderson, 962 F.2d 187, 191 (2d Cir. 1992).  Additionally, as previously discussed, under Tellabs, plaintiffs pleading 10(b) and 10b-5 violations must plead facts which give rise to a cogent inference of scienter. 127 S. Ct. 2499 (2007).  Here, the First Amended Complaint fails to make specific allegations of false misrepresentations or omissions.  Plaintiff broadly asserts that the Broker Defendants made false misrepresentations that deceived Plaintiffs into purchasing securities (see Pl.'s First Am. Compl. ¶ 319), but Plaintiff fails to specify how or if the Broker Defendants ever dealt, spoke, or interacted with the defendants or how the Broker Defendants ever benefited from the alleged parking scheme to the detriment of the Plaintiffs.  For instance, one alleged fraudulent transaction is described only as "serv[ing] the purpose of moving the price . . . up." (Id. ¶ 274.) The allegations are, for the most part, conclusory, and thus fail to meet the heightened pleading standard under Rule 9(b) and the PSLRA.

On Plaintiff's second claim, market manipulation under Section 10(b) and 10b-5, Judge Casey previously dismissed the claim for failure to plead with particularity, with leave to replead the non-time barred claims of James Bailey and the Burgesses.  For many of the same reasons that Plaintiff's first claim fails, this claim must also be dismissed.  At a minimum, to survive a motion to dismiss, Plaintiffs must show damage, caused by reliance on defendants'

misrepresentations or on a scheme by the defendants to defraud, and scienter. See Conseco, 43 F. Supp. 2d at 448.  Plaintiffs allege that the Broker Defendants were engaged in a parking scheme, but they use only conclusory language to show damage ("pervasive parking . . . continuously effected the market" (Pl.'s First Am. Compl. ¶ 44)), reliance ("in reliance on . . . the appearance of purchasing activity . . . plaintiffs purchased the [securities]")(id. ¶ 332)), and scienter (stating only that "defendants each acted with knowledge of their manipulative and deceptive character or were reckless with respect thereto" (id. ¶ 331)).  On very similar pleadings, Judge Casey dismissed the original complaint because it failed to specify how the alleged manipulation affected the market for specific securities and how plaintiffs were harmed by the manipulation. Fezzani I, 384 F. Supp. 2d at 643.  For the reasons discussed, this cause of action is also dismissed.

Plaintiff also brings state-law claims against the Broker Defendants for civil conspiracy to defraud and aiding and abetting fraud.  As an initial matter, the Broker Defendants argue that the Court should dismiss the state-law claims for lack of jurisdiction.  Broker Defendants argue that the Court's pendent jurisdiction over the state-law claims under 28 U.S.C. § 1367 is dependent on the Court's jurisdiction over viable federal-law claims.  Jurisdiction over state-law claims once the underlying federal-law claims have been dismissed, however, is in the discretion of the district court. See Morse v. Univ. of Vermont, 973 F.2d 122, 127-28 (2d Cir. 1992).  The Court recognizes that "[w]hen all bases for federal jurisdiction have been eliminated from a case so that only pendent state claims remain, the federal court should ordinarily dismiss the state claims." Baylis v. Marriott Corp., 843 F.2d 658, 665 (2d Cir. 1988) (citing United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 725 (1966)).  On the other hand, this case has been in the federal system since 1999, and it may well be regarded as a trespass to federal-state relations to now

transfer to New York Supreme Court these aged state claims.  Accordingly, the Court exercises

its discretion to retain jurisdiction over the state-law claims under § 1367 and review Plaintiffs'

claims on the merits.

The remaining state-law claims (conspiracy to commit fraud and aiding and abetting

fraud) are not pled with the required particularity.  Plaintiffs' claim of civil conspiracy to defraud

is subject to the heightened pleading standard set forth in Rule 9(b) of the Federal Rules of Civil

Procedure.  Rule 9(b) requires the "party averring fraud or mistake to state with particularity 'the

circumstances constituting [the] fraud or mistake.'" Filler v. Hanvit Bank, No. 01 Civ. 9510

(MGC), 2003 WL 22110773, at *2 (S.D.N.Y. Sept. 12, 2003) (citing Fed.R.Civ.P. 9(b)).  The

party claiming fraud must specify the statements that were allegedly false or misleading, state

when and where the statements were made, identify the people or groups that made the

statements, and explain how the statements were fraudulent. See Cosmas v. Hassett, 886 F.2d 8,

11 (2d Cir. 1989).  Here, Plaintiffs have failed to meet the 9(b) standard.  Plaintiffs allege that

Fahnestock brokers Philip Lifschitz and Steven Grodko helped coordinate parking arrangements

(See Pl.'s First Am. Compl. ¶¶ 134, 261, 263, 269, 273, 277.)  Lifschitz and Fahnestock trader

Allan Rothstein were allegedly permitted to participate in pre-IPO financing of one of Baron's

propped-up companies, and then to sell their shares at artificially inflated prices. (Id. ¶ 275.)

None of the allegations specify how these actions were false or misleading, as required by Rule

9(b).  Finally, Plaintiffs fail to state a claim for civil conspiracy to defraud because they cannot

make out all required elements.  To state a proper claim the plaintiff must allege both a

primary tort and also show the four elements of a conspiracy:  "(1) a corrupt agreement between

two or more parties; (2) an overt act in furtherance of the agreement; (3) the parties' intentional

participation in the furtherance of a plan or purpose; and (4) resulting damage or injury." Best

Cellars, 90 F. Supp. 2d at 446.  At a minimum, Plaintiffs have failed to properly allege how the Broker Defendants' actions resulted in damage to the Plaintiff.  Accordingly, Plaintiffs' fifth claim of action is dismissed.

Plaintiff's sixth claim of action against the Broker Defendants, aiding and abetting fraud, is dismissed for the same failure to plead with specificity.  See Renner v. Chase Manhattan Bank, No. 98 Civ. 926 (CSH), 2000 WL 781081, at *5 (S.D.N.Y. June 16, 2000) ("Rule 9(b)'s requisite pleading with particularity applies equally to claims for fraud and aiding and abetting fraud.").  Additionally, as above, Plaintiffs have failed to establish all the requisite elements of their claim.  To properly allege aiding and abetting fraud, a party must show: "(1) a violation by the primary wrongdoer, (2) knowledge of the wrongful conduct by the aider and abettor, and (3) substantial assistance by the aider and abettor in achieving the violation." OSRecovery, 354 F. Supp. 2d at 377.  Even if Plaintiffs could establish the first two elements of the claim, Plaintiffs have failed to properly allege the "substantial assistance" element.  Plaintiffs' bare conclusions that the Broker Defendants' alleged participation in the parking scheme provided substantial assistance to Baron's criminal activity is not enough to survive a motion to dismiss.  Plaintiff's sixth cause of action is thereby dismissed against the Broker Defendants.

### iii.  Allegations Against the Dweck Defendants

While Plaintiffs' First Amended Complaint names ten individual Dwecks as defendants, the allegations deal solely with the actions of Isaac R. Dweck.  Plaintiffs say that Isaac Dweck provided financial support to Baron, was a conduit for bringing other people into the conspiracy, and assisted in the fraudulent parking transactions. (See Pl.'s First Am. Compl. ¶¶ 253, 257, 260, 261, 263.)  As for Isaac Dweck's family members, Plaintiffs allege only that Isaac Dweck was their agent and managed accounts in their name that benefitted from Isaac Dweck's relationship

23

to Baron.  (Id. ¶ 261.)  Plaintiffs claim that this relationship alone is sufficient to include the nine additional Dweck family members as defendants.  The First Amended Complaint includes the Dweck Defendants in the first, second, fifth, and sixth claims.

As to the first claim, misrepresentations or omissions under Section 10(b) or Rule 10b-5, a plaintiff must allege that the defendant, in connection with the purchase or sale of securities, acting with scienter, made a false material representation or omitted to disclose material information, and that the plaintiff's reliance on defendant's action caused the plaintiff's injury. See Rothman v. Gregor, 220 F.3d 81, 89 (2d Cir. 2000).

The First Amended Complaint alleges that Dweck was substantially funding and participating in Baron's fraudulent transactions, but it does not allege any misrepresentations or omissions that any of the Dweck Defendants made to Plaintiffs.  The complaint also does not properly allege reliance on Dweck's actions.  Plaintiffs can only point to their assertions of Dweck's various investments in Baron securities, Dweck's assistance in the parking transactions, and Dweck's alleged introductions of new co-conspirators to the fraud.  None of this satisfies the requirement that Plaintiffs allege a false material misrepresentation or omission. Id.  Nor can Plaintiffs properly allege reliance, another required element of their claim.  Plaintiffs generally claim in their complaint that the parking transactions and overall fraud caused the price of Baron's securities to artificially inflate, creating damage to the Plaintiffs when they purchased the eventually worthless stock.  But these broad allegations do not show how the Plaintiffs relied on misrepresentations or omissions by the Dweck Defendants, as required.  Accordingly, the first claim of action is dismissed as to the Dweck Defendants.

Similarly, Plaintiffs' claim for market manipulation against the Dweck Defendants fails to sufficiently plead the necessary elements.  Plaintiffs must allege:  "(1) damage, (2) caused by

24

reliance on defendants' misrepresentations or omissions of material fact, or on a scheme by the

defendants to defraud, (3) scienter, (4) in connection with the purchase or sale of securities, (5)

furthered by the defendants' use of the mails or any facility of a national securities exchange."

Schnell, 43 F. Supp. 2d at 448.  As with their first claim, Plaintiffs fail to properly plead the

Defendants' fraudulent conduct or the reliance by the Plaintiffs on that conduct.  As with the first

claim, the lack of factual allegations showing reliance upon Dweck's alleged fraudulent behavior

is particularly obvious.  The broad allegation that Plaintiffs relied on the Dweck Defendants'

actions is not enough to survive a motion to dismiss.  Thus, the second claim against the Dweck

Defendants is dismissed.

Plaintiffs also bring state-law claims against the Dweck Defendants.  While the Dweck

Defendants did not raise the same jurisdictional challenge as the Broker Defendants, the

dismissal of the Plaintiffs' state-law claims has the same jurisdictional implications.  For the

same reasons as stated before, the Court will retain jurisdiction over the state law claims and

dismiss the claims on the merits.

A plaintiff may only plead the tort of civil conspiracy where the plaintiff can allege a

primary tort and also show the four elements of a conspiracy: (1) a corrupt agreement between

two or more parties; (2) an overt act in furtherance of the agreement; (3) the parties' intentional

participation in the furtherance of a plan or purpose; and (4) resulting damage or injury. See

Chrysler Capital Corp. v. Century Power Corp., 778 F. Supp. 1260, 1267 (S.D.N.Y. 1991).

Plaintiffs have not met these requirements.  As before, Plaintiffs have failed to show a clear

connection between the Dweck Defendants' alleged fraudulent behavior and the damage suffered

by Plaintiffs.  The conclusory allegations that Defendants "authorized numerous parking

transactions" (See Pl.'s First Am. Compl. ¶ 261) and "creat[ed] a false appearance of an active

trading market with the intent of inflating the trading price of the [securities]" (id. ¶ 10) are insufficient.  Accordingly, Plaintiffs fifth claim of action is dismissed.

The Court dismisses Plaintiff's sixth cause of action—aiding and abetting fraud—for the same reasons that the Court dismissed Plaintiffs' sixth action against the Broker Defendants. Defendants have failed to plead the allegations of fraud with the particularity that Rule 9(b) requires, nor can they make out the required elements.  The sixth claim of action is thereby dismissed against the Dweck Defendants.

### iv.  Allegations Against the Wolfson Defendants

Plaintiff's First Amended Complaint names the Wolfson Defendants only in the fifth and sixth causes of action, the state-law claims for civil conspiracy to defraud and aiding and abetting fraud.  The Wolfson Defendants were allegedly investors in Baron securities who permitted Baron to park security sales in their accounts. (Id. ¶¶ 10, 135, 281, 285, 288.)  The Wolfson Defendants also allegedly were "allowed" to sell their own Baron securities at inflated prices before prices inevitably crashed. (Id. ¶ 10.)

The Wolfson Defendants argue that the Court lacks subject matter jurisdiction over the Plaintiffs' claims because there are no federal-law claims alleged against them, Plaintiffs failed to assert diversity jurisdiction, and the common-law claims asserted do not form part of the same case or controversy as the Plaintiff's federal-law claims against other defendants.  Because Plaintiffs have not asserted any federal-law claims against the Wolfson Defendants, the Court's jurisdictional analysis under 28 U.S.C. § 1367 is slightly different than the previous analysis. Here, jurisdiction would not lie in the connection of state-law claims to an anchoring federal-law claim asserted against the Wolfson Defendants.  Instead, jurisdiction exists because Plaintiffs' claims against the Wolfson Defendants emanate from the same set of facts that give rise to the

federal-law claims against the other defendants.  Under 28 U.S.C. § 1367(a), a court can exercise pendent-party jurisdiction "where the claim in question arises out of the same set of facts that give rise to an anchoring federal question claim against another party." Kirschner v. Klemons, 225 F.3d 227, 239 (2d Cir. 2000).  Here, the state-law claims against the Wolfson Defendants arise out of the same underlying fraudulent scheme that Plaintiffs alleged against all the Defendants.  Even though the claims against the Wolfson Defendants stem from their alleged conduct as Baron investors, rather than as brokers or bankers, the underlying allegations share a common nucleus of facts.  Thus, the Court retains jurisdiction over the state-law claims and will rule on the merits of Plaintiffs' assertions.

Plaintiffs' fifth cause of action fails because the First Amended Complaint does not meet the heightened pleading requirement of Rule 9(b).  Civil conspiracy to defraud requires a plaintiff to allege a primary tort and also show the four elements of a conspiracy: (1) a corrupt agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3) the parties' intentional participation in the furtherance of a plan or purpose; and (4) resulting damage or injury. See Chrysler Capital, 778 F. Supp. at 1267.  Plaintiffs' claim fails to properly allege the first of the four elements—a corrupt agreement between the parties.  Here, Plaintiffs claim that the "Wolfsons entered into a conspiracy with Baron when they accepted Bressman's proposals and agreed . . . to assist Bressman in his fraudulent trading practices . . . ." (See Pl.'s First Am. Compl. ¶ 280.)  Such an allegation does not meet the particularity requirements of Rule 9(b).  Plaintiffs state conclusions, not specifics, about the alleged agreement and how this agreement occurred.  Rule 9(b) requires more. See De Atucha v. Hunt, 128 F.R.D. 187, 190 (S.D.N.Y. 1989) (finding that allegations of a conspiracy to defraud were insufficient under Rule 9(b) where the complaint specified times and locations that defendants met, but failed to state

27

"how each defendant agreed with any of the other defendants to engage in the alleged conspiracy").  The fifth cause of action against the Wolfson defendants is thereby dismissed.

The sixth cause of action, for aiding and abetting fraud, is dismissed as well.  Under New York law, aiding and abetting fraud requires a plaintiff to show the existence of a fraud, defendant's knowledge of the fraud, and that the defendant provided substantial assistance to advance the fraud's commission.  See Wight v. BankAmerica Corp., 219 F.3d 79, 91 (2d Cir. 2000) (citations omitted).  On the "substantial assistance" prong, the complaint must allege that the aider and abettor's activities were a proximate cause of the plaintiff's harm.  See Filler, 2003 WL 22110773, at *2.  Allegations of a "but for" causal relationship are not sufficient to create aider and abettor liability—where the plaintiff's injury is not a direct or reasonably foreseeable result, a defendant will not be liable.  See Bloor v. Carro, Spanbock, Londin, Rodman & Fass, 754 F.2d 57, 62-63 (2d Cir. 1985) (citations omitted).  Here, Plaintiffs have not sufficiently alleged that the acts mentioned in the First Amended Complaint were a proximate cause of the Plaintiffs' injuries.  The complaint alleges that the Wolfson Defendants allowed Baron to execute trades on their behalf without prior authorization (See Pl.'s First Am. Compl. ¶ 283) and that the Wolfsons arranged to park transactions in their accounts and received "substantial" profits from these trades. (Id. ¶ 285.)  The complaint states that the Wolfson Defendants knew that these transactions would result in the Plaintiffs believing that they were trading in securities at market prices—rather than at fraudulently inflated prices—because "of their knowledge and experience in the securities markets" and because "they had been so informed by Bressman." (Id. ¶ 293.) The complaint places partial liability on the Wolfson Defendants for Plaintiffs' losses, yet it also acknowledged that Bressman, on behalf of Baron, was the one controlling the trades in the Wolfson accounts. (Id. ¶¶ 283, 291.)  These allegations do not sufficiently allege that the

28

Wolfson Defendants' participation in the fraud was a proximate cause of the Plaintiffs' harm. The sixth cause of action is therefore dismissed for failure to state a claim.

### v. Allegations Against Arthur Bressman

Arthur Bressman is the father of Andrew Bressman, who is described in the First Amended Complaint as "either the President or Chief Executive Officer of Baron." (Id. ¶ 57.) Arthur Bressman's only alleged wrongdoing is described in paragraph 58 of the First Amended Complaint. It alleges that Arthur Bressman, "was a de facto executive of Baron, through his influence over his son, and his value to the firm as source of business deals." The Complaint lumps Arthur Bressman in with the other Baron Defendants, who, with the exception of Arthur Bressman, have all been convicted of criminal offenses in New York State court. (Id. ¶¶ 2, 315, 316.) Arthur Bressman was neither charged nor convicted of criminal conduct in relation to this scheme. The Complaint includes Arthur Bressman as a defendant in all six causes of action. Based on the scant allegations of Bressman's wrongdoing and involvement, alleged only in one paragraph out of 357, and, even then, with only conclusory language, the Court dismisses all claims for failure to state a claim. Alleging that Arthur Bressman is liable based only on "his influence over his son" and "his value to the firm as source of business deals" is simply not enough to meet the pleading requirements under almost any standard. It is certainly not sufficient under Rule 9(b)'s heightened pleading requirement.

### vi. Allegations Against the Apollo Defendants

The Apollo Defendants are alleged to have paid bribes to Baron in exchange for Baron recommending that Plaintiffs and others purchase securities owned by Apollo. The complaint claims that the Apollo Defendants approached Baron and suggested that Baron sell shares of the Jockey Club stock at a rate that would result in a $3 million profit for Apollo, which Apollo

would then split with Baron. (Id. ¶¶ 301-308.)  Additionally, the First Amended Complaint alleges that the Apollo Defendants were involved in "similar corrupt sales" for U.S. Bridge, CESI (also referred to as Comprehensive Environmental), and Icis stocks. (Id. ¶ 309.)  Plaintiffs include the Apollo Defendants in the claims for:  market manipulation under Section 10(b) and Rule10b-5; civil conspiracy to defraud; and aiding and abetting fraud.

In Fezzani I, Judge Casey found that the Plaintiffs had stated a claim for market manipulation and for aiding and abetting breach of fiduciary duty against the Apollo Defendants. 384 F. Supp. 2d at 645, 647.  Judge Casey limited those claims to Plaintiff James Bailey's claims against the Apollo Defendants, id., and further limited those claims to purchases that took place from February 2, 1996 until Baron's bankruptcy. Id. at 631.  However, plaintiff now brings its claim for market manipulation on behalf of Bailey and named plaintiffs Margaret and Patrick Burgess and the Bootlesville Trust, a trust established by the Burgesses.  Defendant argues that Judge Casey's ruling in Fezzani I precluded any claims except for those by Bailey, because he was the only Plaintiff to allege that he purchased Jockey Club stock after February 1, 1996.  The Apollo Defendants thus argue that the market manipulation claims brought by the Burgesses and the Bootlesville Trust should be dismissed.  Plaintiffs, however, have also alleged that, as a result of the defendant's fraudulent acts, the Bootlesville Trust purchased shares of Comprehensive Environmental on February 12, 2006, well within the dates that are subject to this lawsuit. (See Pl.'s First Am. Compl. ¶ 309, Ex. C.)  Plaintiffs argue that, in accordance with Judge Casey's prior ruling, they should be able to include this transaction and the Bootlesville Trust within their claim.  The Court need not decide this dispute, because the Court finds that the allegations that the Bootlesville Trust was harmed by the Apollo Defendants' market manipulation inadequately pled.

A claim for market manipulation under Rule 10b-5 requires the plaintiff to show, at a minimum, a causal relationship between the defendants' scheme to defraud and the damage suffered by the plaintiff. See Schnell, 43 F. Supp. 2d at 448 (noting that the first two elements of a market manipulation claim are: "(1) damage, [and] (2) caused by reliance on defendants' misrepresentations or omissions of material fact, or on a scheme by the defendants to defraud"). Additionally, the PSLRA requires allegations of fraud in a securities suit to contain the particularities of the facts and the alleged fraud. See Tellabs, 127 S. Ct. at 2504. In Fezzani I, Judge Casey found that Plaintiff Bailey had established a claim against the Apollo Defendants because Bailey properly alleged: (1) The Apollo Defendants approached Baron about causing the Jockey Club shares to be sold; (2) the Apollo Defendants suggested splitting the proceeds of the sale; (3) the plan and execution of the scheme were laid out in detail; and (4) as part of the scheme, Bailey suffered harm. 384 F. Supp. 2d at 644. With all these details properly pled, Judge Casey denied the motion to dismiss the Bailey claims against the Apollo Defendants. Id. at 644-45. As to the current allegations of the Bootlesville Trust in the First Amended Complaint, the description of the Apollo Defendants' connection to the Trust's purchase of Comprehensive Environmental stock is woefully lacking. The only reference in the First Amended Complaint to the Bootlesville Trust's purchase of any stock as a result of the Apollo Defendant's actions is a vague reference to "similar corrupt sales by the Apollo Defendants of U.S. Bridge, CESI [also referred to as Comprehensive Environmental], and Icis." (See Pl.'s First Am. Compl. ¶ 309.) This fails under both Rule 9(b)'s and the PSLRA's particularized pleading standard. Thus, the Court finds that the market manipulation claims of the Burgesses and Bootlesville Trust fail to state a claim. As Judge Casey found in Fezzani I, however, the Bailey market manipulation claim survives.

The state-law claims against the Apollo Defendants also survive the motion to dismiss. As discussed previously, to bring a claim of civil conspiracy to defraud, a plaintiff must plead an underlying tort and the elements of conspiracy: (1) a corrupt agreement between at least two parties; (2) an overt act in furtherance of the agreement; (3) the parties' intentional participation in the furtherance of a plan; and (4) resulting damage. See Lewis, 138 F. Supp. 2d at 479. Here, the underlying tort is the common-law fraud claim against the Baron Defendants. The conspiracy claim against the Apollo Defendants meets the four-part test. First, the complaint alleges a corrupt agreement by stating that the Apollo Defendants approached Bressman and planned a scheme to defraud Baron investors to the benefit of Apollo and Baron. (See Pl.'s First Am. Compl. ¶ 300.) The overt act and evidence of intentional participation are both shown by allegations of Apollo's payment of $1.5 million to Baron—its half of the fraudulently obtained earnings. (Id. ¶ 302.) Finally, plaintiffs have alleged resulting damage from the conspiracy. (Id. ¶ 354.) Accepting as true Plaintiff's factual allegations, as the Court must on a motion to dismiss, see Allaire Corp., 433 F.3d at 249-50, the Court finds that the Apollo Defendants have not shown that Plaintiffs can prove no facts that would entitle them to relief. The Apollo Defendants' motion to dismiss the claim for civil conspiracy to defraud is denied.

Finally, Plaintiffs' claim of aiding and abetting fraud also survives the Apollo Defendants' motion to dismiss. As discussed, the elements of a claim for aiding and abetting fraud are: (1) a violation by the primary wrongdoer, (2) knowledge of the wrongful conduct by the aider and abettor, and (3) substantial assistance by the aider and abettor to achieve the violation. OSRecovery, 354 F. Supp. 2d at 377. The substantial assistance requirement is satisfied where a defendant helps conceal, affirmatively assists, or enables the fraud to proceed. Nigerian Nat'l Petroleum Corp. v. Citibank, N.A., 98 Civ. 4960 (MBM), 1999 WL 558141, at *8

(S.D.N.Y. July 29, 1999). The abettor must also proximately cause the harm. McDaniel, 196 F. Supp. 2d at 352. Here, the Plaintiffs have sufficiently pled a primary violation by Baron in selling securities through fraudulent means. The knowledge element is pled by alleging that the Apollo Defendants were the initiators of the scheme to sell Jockey Club stock at an artificially inflated price to unknowing investors. (See Pl.'s First Am. Compl. ¶ 300.) As for substantial assistance, Plaintiffs have adequately pled that the Apollo Defendants affirmatively assisted Baron in the fraud by approaching Baron with the scheme, offering up its Jockey Club shares, and paying Baron half the earnings as part of the agreement. (Id. ¶¶ 300, 302, 303.) The Apollo Defendants were also the proximate cause of the Plaintiffs' harm, as they allegedly helped plan, execute, and fund the scheme. The Apollo Defendants' motion to dismiss the claim for aiding and abetting fraud is denied.

## III. Conclusion

For the foregoing reasons, the motions to dismiss the claims are GRANTED for all defendants except for the Apollo Defendants. The motion to dismiss the claims against the Apollo Defendants is DENIED.

Dated: New York, New York
September 22, 2008

SO ORDERED

PAUL A. CROTTY
United States District Judge

Copies (E-mailed)/ Mailed / Faxed
By Chambers

33