UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                                                    :
MOHAMMED FEZZANI *et al.*,                                          :
                                                                    :
                                        Plaintiffs,                 :
                                                                    :                99 Civ. 793 (JPC)
                        -v-                                         :
                                                                    :                <u>OPINION AND ORDER</u>
                                                                    :
ISAAC R. DWECK, individually and as custodian for                  :
Nathan Dweck, *et al.*,                                             :
                                                                    :
                                        Defendants.                 :
                                                                    :
------------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

Pending before the Court are motions for summary judgment on Plaintiffs' sole remaining claim for aiding and abetting fraud under New York law. The motions are brought by the two remaining groups of Defendants: (1) Isaac R. Dweck (individually and as custodian for Nathan Dweck), Barbara Dweck, Morris I. Dweck, Ralph I. Dweck, and Jack Dweck (collectively, "the Dwecks"), and (2) Aaron Wolfson, the Estate of Abraham Wolfson,[1] and Morris Wolfson (collectively, "the Wolfsons"; with the Dwecks, "Defendants"). For the following reasons, the motions are granted.

---

[1] As of the time of this decision, Plaintiffs' motions to substitute Reyad Fezzani for Plaintiff Mohamed Fezzani, Dkts. 528-529, and Shlomo Wolfson for Defendant Abraham Wolfson, Dkt. 472, under Federal Rule of Civil Procedure 25 remain pending. Because the Court ultimately grants summary judgment in favor of Defendants, these motions are denied as moot. *See Salveson v. JPMorgan Chase & Co.*, 860 F. App'x 207, 208 n.1 (2d Cir. 2021).

## I. Background

### A.    Facts

Given this case's extremely lengthy history, the parties in large part (and understandably) did not focus on the basic background in their briefing.  Nevertheless, as the Honorable Paul A. Crotty—to whom this case was previously assigned—succinctly summarized:

> From May 1992 until July 1996, A.R. Baron [a broker dealer ('Baron')] and its officers, employees, and co-conspirators perpetuated a massive securities fraud scheme.  Plaintiffs were Baron customers during the relevant time period and commenced this action in 1999 against eleven organizations and individuals for their alleged participation in the scheme.  After [25] years, full bankruptcy proceedings, the convictions of Baron and its officers, and a seemingly endless barrage of litigation, the Wolfson Defendants and the Dweck Defendants are the sole remaining Defendants in this case.

*Fezzani v. Bear, Stearns & Co.*, No. 99 Civ. 793 (PAC), 2023 WL 2612454, at *1 (S.D.N.Y. Mar. 23, 2023).  Plaintiffs characterize the fraudulent scheme as a "pump and dump" in which "Baron sold securities in a small number of small issuers, trading in the over-the-counter markets, referred to as the Baron 'House Stocks.'"  Dkt. 502 ("Opposition") at 7.  As explained by Roman Okin, who was Plaintiffs' broker at Baron, the Wolfsons and the Dwecks were allegedly part of "a small group of 'favored' investors . . . [who] received special treatment and various financial benefits from Baron including guaranteed profit, pre-arranged securities trades in exchange for providing capital for the firm and permitting their accounts to be used for parking shares of . . . [H]ouse [S]tocks."  Dkt. 498 ("Okin Decl.") ¶ 11; *see id.* ¶ 8 (listing Plaintiffs as Okin's customers).  Plaintiffs explain that parking "involves placing stock in a favored investor's account while the broker promises to buy back shares, if necessary, at a price that affords the insider a guaranteed profit."  Opposition at 24.  As the Second Circuit described, Plaintiffs allege that "[b]ased on Baron's salespeople's false representations of trading volume and increasing stock prices inducing customers to buy, Baron and its co-conspirators would sell their holdings at a profit before the

stock crashed." *Fezzani v. Bear, Stearns & Co.*, 716 F.3d 18, 21 (2d Cir. 2013) ("2d Cir. 2013 Opinion"). While Defendants dispute many of Plaintiffs' characterizations of their conduct, these disputes are of no moment in light of the analysis below.

**B.    Procedural History**

The Court briefly summarizes the procedural history of this case that is relevant to the instant motions. As noted above, Plaintiffs instituted this action in 1999, Dkt. 1, and they filed the operative Amended Complaint in 2005, Dkt. 98. Judge Crotty dismissed many of the defendants in this case, including the Wolfsons and the Dwecks, from the action in 2008. *See Fezzani v. Bear, Stearns & Co.*, 592 F. Supp. 2d 410, 416 (S.D.N.Y. 2008). On appeal, the Second Circuit affirmed the dismissals except for Plaintiffs' New York law claims for civil conspiracy to defraud and aiding and abetting fraud against the Dwecks and the Wolfsons. *See* 2d Cir. 2013 Opinion (regarding the Dwecks); *Fezzani v. Bear, Stearns & Co.*, 527 F. App'x 89, 92 (2d Cir. 2013) ("2d Cir. 2013 Summary Order") (regarding the Wolfsons). The Circuit subsequently denied a motion for panel rehearing. *See Fezzani v. Bear, Stearns & Co.*, 777 F.3d 566, 568 (2d Cir. 2015) ("2d Cir. 2015 Opinion").

On remand, the parties "agreed to truncate discovery in an effort to expedite the resolution of the lawsuit"; Judge Crotty then granted summary judgment in favor of Defendants in 2018. *Fezzani v. Bear, Stearns & Co.*, No. 99 Civ. 793 (PAC), 2018 WL 324897, at *1 (S.D.N.Y. Jan. 5, 2018). The Circuit vacated this decision the following year. *See Fezzani v. Dweck*, 779 F. App'x 815, 818 (2d Cir. 2019). In July 2023, Judge Crotty granted Defendants' motion for judgment on the pleadings on the conspiracy claim against them, leaving only the aiding and abetting fraud claim. *See Fezzani v. Bear, Stearns & Co.*, No. 99 Civ. 793 (PAC), 2023 WL 4625544, at *7 (S.D.N.Y. July 19, 2023).

Defendants filed their motions for summary judgment thereafter. Both sets of Defendants filed their opening briefs on September 2, 2023. Dkt. 476 ("Dweck Motion"); Dkt. 479 (original Wolfson motion). After Judge Crotty dismissed certain Plaintiffs from this action on October 5, 2023, Dkt. 490, the Wolfsons re-filed their motion on October 12, 2023, Dkt. 493 ("Wolfson Motion"). Plaintiffs filed their opposition on October 21, 2023, Dkt. 502, and Defendants filed their reply briefs on November 13, 2023, Dkts. 511 (Wolfson reply), 512 (Dweck reply). Defendants also filed motions to strike certain evidence proffered by Plaintiffs that same day. Dkts. 510 ("Dweck Motion to Strike"), 515 (Wolfson motion to strike). Plaintiffs filed their opposition to this motion on November 30, 2023, Dkt. 516, and Defendants filed their reply briefs on December 6, 2023, Dkts. 517 (Wolfson reply), 518 (Dweck reply).

This case was reassigned to the undersigned on April 15, 2024. *See* April 15, 2024 Minute Entry.

## II. Motions for Summary Judgment and to Strike

### A. Legal Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The movant bears the initial burden of demonstrating "the absence of a genuine issue of material fact," *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), and may discharge its burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden

of proof at trial," *id.* at 322. "If the moving party meets its initial burden, the nonmoving party must then 'set forth specific facts showing that there is a genuine issue for trial' using affidavits or other evidence in the record, and cannot rely on the 'mere allegations or denials' contained in the pleadings." *Taylor v. City of New York*, No. 19 Civ. 6754 (KPF), 2022 WL 744037, at *6 (S.D.N.Y. Mar. 11, 2022) (quoting *Anderson*, 477 U.S. at 248). The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts . . . and . . . may not rely on conclusory allegations or unsubstantiated speculation . . . . [A] nonmoving party must offer some hard evidence showing that its version of the events is not wholly fanciful." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (internal quotation marks and citations omitted); s*ee also Anderson*, 477 U.S. at 252 (requiring the non-movant to present more than a "scintilla of evidence"). "Where no rational finder of fact could find in favor of the nonmoving party because the evidence to support its case is so slight, summary judgment must be granted." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (internal quotation marks and citation omitted).

In deciding a motion for summary judgment, the Court must "resolve all ambiguities and draw all justifiable factual inferences in favor of the party against whom summary judgment is sought." *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). At the same time, however, "in considering 'what may reasonably be inferred' from witness testimony, the court should not accord the nonmoving party the benefit of 'unreasonable inferences, or inferences at war with undisputed facts.'" *Taylor*, 2022 WL 744037, at *7 (quoting *Berk v. St. Vincent's Hosp. & Med. Ctr.*, 380 F. Supp. 2d 334, 342 (S.D.N.Y. 2005)).

**B.    Law of the Case**

A central issue in resolving the pending summary judgment motions is the scope of Plaintiffs' aiding and abetting fraud claim and, more specifically, the impact of the Second Circuit's prior opinions on that cause of action.  The parties remain extremely far apart on this issue.  As they summarized in their joint status letter of April 29, 2024, their disagreement over the scope of this remaining cause of action has prevented any meaningful resolution of this case for well over a decade.  Dkt. 523 at 5.

The parties do not dispute the basic legal framework for aiding and abetting fraud under New York law, which they agree applies to Plaintiffs' claim.  *See* Dweck Motion at 6; Wolfson Motion at 8; Opposition at 23.  "To establish liability for aiding and abetting fraud under New York law, a plaintiff must show (1) the existence of a fraud; (2) the defendant's knowledge of the fraud; and (3) that the defendant provided substantial assistance to advance the fraud's commission."  *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 292 (2d Cir. 2006) (cleaned up).  "To satisfy the knowledge prong, a plaintiff must demonstrate that the defendant had actual knowledge of the underlying fraud."  *Pennington v. D'Ippolito*, 855 F. App'x 779, 783 (2d Cir. 2021) (citing *Oster v. Kirschner*, 905 N.Y.S.2d 69, 72 (1st Dep't 2010)); *accord Lerner*, 459 F.3d at 292.  "Constructive knowledge does not suffice."  *Pennington*, 855 F. App'x at 783.  In turn, "[u]nder New York law, the five elements of fraud are (1) a material misrepresentation or omission of fact (2) made by a defendant with knowledge of its falsity (3) and intent to defraud; (4) reasonable reliance on the part of the plaintiff; and (5) resulting damage to the plaintiff."  *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 13 F.4th 247, 259 (2d Cir. 2021) (cleaned up).[2]

---

[2] The parties vigorously dispute whether Plaintiffs need to prove their aiding and abetting claim by a preponderance of the evidence or by clear and convincing evidence, but this dispute is

The most significant discrepancy between the parties' positions concerns the underlying fraud. Per Plaintiffs, the underlying fraud constitutes "statement[s] that Baron was a legitimate brokerage firm engaged in legitimate trading or the fraudulent omission to disclose [that] the entire Baron enterprise was in fact fraudulent." Opposition at 17. By contrast, the Dwecks assert that the underlying fraud constitutes "Baron s[elling] shares to [Plaintiffs] at prices that were manufactured by Baron salespeople but were represented as set by trading in a market that was falsely represented to exist." Dweck Motion at 7 (quoting 2d Cir. 2015 Opinion, 777 F.3d at 572). The Wolfsons broadly agree with the Dwecks' characterization, stating that prior decisions in this case have "restricted the aiding and abetting claim to include only: (1) trades the Plaintiffs authorized Baron to execute on their behalf; and, in connection with those trades (2) proof of specific misrepresentations by Baron relating to each individual Plaintiff trade." Wolfson Motion at 3. Plaintiffs object to these characterizations, contending that the "predicate fraud in this case is not . . . about treating individual purchases or sales in isolation, . . . [but] about whether a reasonable jury could find [that] the entire Baron criminal scheme was a fraud." Opposition at 17.

Defendants broadly speaking have the better of the argument. This Court is bound by the Second Circuit's prior descriptions of the Amended Complaint's allegations under the mandate rule. "The mandate rule compels compliance on remand with the dictates of the superior court and forecloses relitigation of issues expressly or impliedly decided by the appellate court." *United States v. Ben Zvi*, 242 F.3d 89, 95 (2d Cir. 2001) (internal quotation marks omitted). "[T]he trial court should look to both the specific dictates of the remand order as well as the broader spirit of the mandate." *Id.* (internal quotation marks omitted).

---

of no moment because the Court would grant summary judgment even under the lower preponderance standard for the reasons discussed below. *See* Wolfson Motion at 8-9 (clear and convincing); Dweck Motion at 5-6 (same); Opposition at 18-22 (preponderance).

The Second Circuit's decisions make clear that the misrepresentation theory alleged in the Amended Complaint concerns, as the Dwecks contend, allegations "only that Baron sold shares to appellants at prices that were manufactured by Baron salespeople but were represented as set by trading in a market that was falsely represented to exist." 2d Cir. 2015 Opinion, 777 F.3d at 572; *see id.* at 573 ("To sum up, the facts alleged in this complaint do not involve any ongoing market affected by false pricing signals by Dweck.  What they involve are misrepresentations to the victims by Baron salespeople as to how the price they were charging for particular securities was arrived at.").  Or as the Circuit summarized in its first decision in this case in 2013:

> [Plaintiffs] alleged that Baron and Bear Stearns falsely represented the securities were trading in "an active, liquid, *bona fide* market," and that [they] believed the price at which the securities were offered was that established by that public market rather than an artificial price established by Baron.  The deception on which [Plaintiffs] relied, therefore, were statements by Baron's salespeople that the customers were buying at a price set by public market activity.

2d Cir. 2013 Opinion, 716 F.3d at 21 (quoting Am. Compl. ¶ 21) (citations omitted).  Notably, the Circuit also concluded that "[i]n the entire 116-page complaint, [Plaintiffs] have not specifically pleaded a causal link between any single stock purchase or sale and a corresponding parking by Dweck or coordinated transactions by others." 2d Cir. 2015 Opinion, 777 F.3d at 572; *see also* 2d Cir. 2013 Opinion, 716 F.3d at 23 ("There is no allegation that any [Plaintiff] was told of Dweck's artificial trading, or purchased such securities in specific reliance on such trading.  Baron and Bear Stearns are the sole sources alleged regarding [Plaintiffs'] perceptions of prices at which trades were being made." (citations omitted)).[3]

---

[3] Of course, this characterization of the Amended Complaint's allegations against the Dwecks was heavily contested by the Honorable Raymond J. Lohier in his dissents.  *See, e.g.*, 2015 2d Cir. Opinion, 777 F.3d at 577 ("[T]o the extent that the opinion suggests that the plaintiffs inadequately alleged reliance on the effect of Dweck's parking, as well as other components of the manipulative scheme, that suggestion is contradicted by the allegations quoted above.") (Lohier,

The Court can discern no reason to find that these characterizations of the Amended Complaint's allegations would not equally apply to Plaintiffs' remaining aiding and abetting fraud claim, even as the Circuit's opinions focused on their dismissed federal securities fraud claims. Rather, the Circuit remanded the aiding and abetting fraud claim because these same allegations sufficed at the pleadings stage for that claim. As the Circuit panel wrote in the 2013 Opinion, "Dweck is sufficiently alleged to have had particular knowledge of some artificial trades, to have participated in them, and to have actively facilitated Baron's fraudulent business generally by loans and other investments. . . . [Plaintiffs] have sufficiently pleaded with particularity that Dweck provided knowing and substantial assistance in financing and facilitating the Baron fraud." 2d Cir. 2013 Opinion, 716 F.3d at 23, 25; *see* 2d Cir. 2013 Summary Order, 527 F. App'x at 92 (holding "that plaintiffs sufficiently pleaded with particularity the involvement of [the Wolfsons] in the alleged conspiracy such that plaintiffs can survive a motion to dismiss as to these three defendants' state law claims" for civil conspiracy to defraud and aiding and abetting fraud). While the Circuit did not explicitly spell out the knowledge aspect of the aiding and abetting fraud claim, the Amended Complaint makes clear that at least the Wolfsons' relevant knowledge was of the

---

J., concurring in part and dissenting in part). But Plaintiffs' quibbles with the Circuit panel majority's reasoning cannot be taken up in this Court. Nor can this Court treat these pronouncements as mere dicta that can be disregarded at this juncture. Ultimately, these characterizations of the Amended Complaint formed the basis of the Second Circuit's decision that Isaac Dweck could not be held liable "as a primary violator," as was required to make out a claim under Section 10(b) of the Securities Exchange Act (the "Exchange Act"), 15 U.S.C. § 78j(b). 2d Cir. 2013 Opinion, 716 F.3d at 24. The same principle applies to the 2015 Opinion, since the Circuit's construal of the Amended Complaint proved crucial in dispelling concerns that the 2013 Opinion had "h[eld] that, in any and all manipulation cases, liability attaches only to persons who communicate a misrepresentation to a victim." 2d Cir. 2015 Opinion, 777 F.3d at 571.

misrepresentations regarding the securities' pricing.[4]  *See* Am. Compl. ¶ 293 ("The Wolfson Defendants were aware, because of their knowledge and experience in the securities markets as well as because they had been so informed by [Andrew] Bressman [Baron's Chief Executive Officer during most of the relevant period], that Baron customers, such as Plaintiffs, would have the beliefs outlined above," *i.e.*, that Plaintiffs "were buying and selling securities at actual market prices rather than buying securities at inflated and manipulated prices").  It also is confirmed by the Amended Complaint's stated (and since dismissed) theory of common law fraud, which was that the Baron Defendants' and Bear Stearns's misrepresentations and omissions to Plaintiffs "cause[d] [P]laintiffs to form false impressions in [their] minds that the [House Stocks] were trading in legitimate, competitive, liquid markets and that prices at which such securities traded were *bona fide* and not the product of manipulation."  *Id.* ¶ 349.

Given these factors, the relevant underlying fraud at issue is not a roving inquiry into malpractice at Baron or misrepresentations "that Baron was a legitimate brokerage firm engaged in legitimate trading," Opposition at 17, but rather a theory centered on Baron brokers' misrepresentations to Plaintiffs that they were buying securities for which a *bona fide* market existed and at prices that were determined by that fictitious market.  Ultimately, Plaintiffs must show that the Wolfsons and the Dwecks had actual knowledge that the Baron brokers made *those*

---

[4] Given the Circuit's later assertion in the 2015 Opinion that there was no allegation of Plaintiffs' reliance on parking transactions in the entire Amended Complaint, the best interpretation of the "knowing . . . assistance" language in the 2013 Opinion is likely that it speaks to Isaac Dweck's intent to use the parking transactions to broadly advance the fraud's commission; perhaps, as the Securities and Exchange Commission ("SEC") concluded, this was to ensure that Baron would meet net capital requirements and thus remain a going concern.  *See* 2d Cir. 2015 Opinion, 777 F.3d at 573 (quoting *In re Bear, Stearns Sec. Corp.*, 70 S.E.C. Docket 537, 1999 WL 569554, *3 n. 6 (1999)).

misrepresentations to Plaintiffs, among other requirements.  That legal framing informs the remainder of the Court's decision.

## C.    Motion to Strike

Before turning to the substance of summary judgment, the Court must resolve one aspect of the Dwecks' motion to strike.  The Dwecks move to strike several statements in the Okin Declaration.  First, they seek to strike paragraphs 11, 12, and 13 of the Declaration, which read in relevant part that:

- "There was a small group of 'favored' investors, sometimes referred to at Baron as 'VIPs.'  They received special treatment and various financial benefits from Baron including guaranteed profit, pre-arranged securities trades in exchange for providing capital for the firm and permitting their accounts to be used for parking shares of A.R. Baron 'house stocks.'"  Okin Decl. ¶ 11.

- "Bressman had explicit agreements of that type . . . with [the Wolfsons], and with Isaac R. Dweck, and agreed to treat them as 'favored' investors.  I know that of my personal knowledge because when Bressman was out of the office, I was responsible for transactions with the Wolfsons and Dweck."  *Id.* ¶ 12.

- "[Isaac] Dweck was often in the Baron office and consulted with Bressman about the operation of the firm.  He introduced the Wolfsons to Baron and because of that relationship had special status."  *Id.* ¶ 13.

The Dwecks argue that these statements should be excluded on the basis that Okin lacks personal knowledge of these matters, as required by Rule 56(c)(4), and that they are speculative and conclusory.  *See* Dweck Motion to Strike at 5-6.

The motion is denied as to these statements.  As relevant here, "[t]he test for admissibility is whether a reasonable trier of fact could believe the witness had personal knowledge." *Searles v. First Fortis Life Ins. Co.*, 98 F. Supp. 2d 456, 461 (S.D.N.Y. 2000) (citation omitted); *accord Folio Impressions, Inc. v. Byer Cal.*, 937 F.2d 759, 764 (2d Cir. 1991) (applying this rule in the context of Federal Rule of Evidence 602).  "The lack of certain specific details or arguably vague statements will not render the affidavit inadmissible, but affect the weight and credibility of the

11

testimony, which have to be determined by the trier of fact at trial." *Han v. Shang Noodle House, Inc.*, No. 20 Civ. 2266 (PKC), 2023 WL 5755213, at *6 n.8 (E.D.N.Y. Sept. 5, 2023) (internal quotation marks omitted). A reasonable trier of fact plainly could believe that Okin had personal knowledge of these matters. Okin declared that he "was the head salesman" at Baron for much of the brokerage's existence and that he "was responsible for transactions with the Wolfsons and Dweck" when Bressman was out of office. Okin Decl. ¶¶ 1, 12. He also declared that he had "personal transactions with Dweck" and discussed stock purchases with Morris and Aaron Wolfson. *Id.* ¶¶ 15-16. That is more than enough at this procedural posture; the Dwecks' objections to Okin's knowledge and the details of his statements affect the weight and credibility the trier of fact should give this testimony should the case proceed to trial.

## D.    Substantial Assistance

As noted above, aiding and abetting fraud requires, among other showings, a showing of substantial assistance to advance the commission of the fraud. *See Lerner*, 459 F.3d at 292. Under New York law, "[s]ubstantial assistance occurs when a defendant affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the [fraud] to occur." *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 345 (2d Cir. 2018).[5] "Substantial assistance requires the plaintiff to allege that the actions of the aider/abettor proximately caused the harm on which the primary liability is predicated. That is, the injury must be a direct or reasonably foreseeable result of the conduct." *Id.* (internal citation and internal quotation marks omitted).

---

[5] Although the cited language in *SPV Osus* concerned breach of fiduciary duty, the Second Circuit explained in that case that "[u]nder New York law, the elements of aiding and abetting a breach of fiduciary duty, aiding and abetting a conversion, and aiding and abetting a fraud are substantially similar." 882 F.3d at 345 (internal quotation marks omitted).

Plaintiffs claim that Defendants substantially assisted the fraud

> by providing funding needed to start and continue Baron's frauds, by introducing other investors who provided Baron necessary capital, by obtaining Bear Stearns as Baron's clearing broker when Baron otherwise would have gone out of business, [and] by keeping Baron in business through (among other means) allowing Bressman to control trading in all of their accounts in a manner that included "parking," "wash sales," and other coordinated trading among accounts to keep Baron from falling below the regulatory and clearing broker required minimum capital.

Opposition at 41-42. The Dwecks raise several objections to Plaintiffs' claims, specifically as to the Dwecks' parking of House Stocks and general financing of the Baron operation. As for parking, the Dwecks accurately point out that New York law requires "a 'nexus between the primary fraud, . . . and what [the alleged aider and abettor] did with the intention of advancing the fraud's commission.'" *Krys v. Pigott*, 749 F.3d 117, 127 (2d Cir. 2014) (quoting *Franco v. English*, 620 N.Y.S.2d 156, 159 (3d Dep't 1994), *abrogated on other grounds*, *Eurycleia Partners, LP v. Seward & Kissel, LLP*, 910 N.E.2d 976 (N.Y. 2009)). The Dwecks' argument is not without reason: as illustrated by the above-quoted excerpt of Plaintiffs' briefing, the Dwecks' parking appears to have helped Baron to abide by net capital requirements (and thereby remain in business), as opposed to anything to do with the more specific fraud on Plaintiffs. As the Dwecks point out, the Second Circuit wrote of this possibility as well, taking note of "the SEC's own description of Baron's frauds . . . that '[w]hile persons may park stock for a variety of reasons[,] Baron parked stock to maintain the appearance of compliance with the commission's net capital rules.'" 2d Cir. 2015 Opinion, 777 F.3d at 573 (quoting *In re Bear, Stearns Sec. Corp.*, 70 S.E.C. Docket 537, 1999 WL 569554, *3 n. 6 (1999)) (alterations in original). The Dwecks are also correct to point to the Circuit's characterization of the Amended Complaint as failing to "specifically plead[] a causal link between any single stock purchase or sale and a corresponding parking by Dweck or coordinated transactions by others." *Id.* at 572; *see* Dweck Motion at 13.

The Court also cannot gainsay the Dwecks' concerns about investment or financing as a form of substantial assistance. The Dwecks accurately point to cases like *SPV Osus*, in which the Second Circuit found that simply providing financing to a fund engaging in fraud "is simply too attenuated to constitute proximate cause." *SPV Osus*, 882 F.3d at 346. The Circuit explained in *SPV Osus* that "if any entity that injected massive sums into [the fund] could be said to have aided and abetted [the] Ponzi scheme, [given the allegation that the plaintiff itself] invested $1.6 billion in [the fund], [the plaintiff] would presumably be subject to liability on the same theory." *Id.* (internal quotation marks omitted). So too here, given at least some of Plaintiffs' individual investments in Baron. *See, e.g.*, Dkt. 475 ("Dweck Rule 56.1 Stmt.") ¶ 91 (noting Plaintiff James Bailey's November 1, 1995 purchase of 140 shares in a Baron entity for $259,259.26).

The challenge for Defendants, however, is that the Second Circuit in its prior rulings in this case simultaneously indicated that the parking was unrelated to Plaintiffs' trading, per its reading of the Amended Complaint, but also concluded that the same parking sufficed for a showing of substantial assistance when combined with financing. As the Circuit wrote in the 2013 Opinion, "[Isaac] Dweck is sufficiently alleged to have had particular knowledge of some artificial trades, to have participated in them, and to have actively facilitated Baron's fraudulent business generally by loans and other investments." 2d Cir. 2013 Opinion, 716 F.3d at 23. While these allegations proved insufficient to make out a Section 10(b) claim under the Exchange Act, the Circuit concluded that Plaintiffs "have sufficiently pleaded with particularity that Dweck provided knowing and substantial assistance in financing and facilitating the Baron fraud . . . [and that] the complaint alleges sufficient involvement by Dweck in the scheme to survive a motion to dismiss." *Id.* at 25. In its parallel unpublished summary order, the Circuit reached much the same result for the Wolfsons. *See* 2d Cir. 2013 Summary Order, 527 F. App'x at 92 ("The Wolfsons are investors

14

who are alleged to have made an express agreement with Baron to help facilitate Baron's fraud by engaging in manipulative 'wash sales' and stock parking in exchange for sweetheart stock purchasing opportunities and other agreements. . . .  Although a close call, . . . we are persuaded that plaintiffs sufficiently pleaded with particularity the involvement of Morris, Aaron, and Abraham Wolfson in the alleged conspiracy such that plaintiffs can survive a motion to dismiss as to these three defendants' state law claims only.").  Given the mandate rule principles discussed above, the Court will not revisit the Circuit's fundamentally *legal* determination about the sufficiency of the Amended Complaint's theory of substantial assistance.

Therefore, while Plaintiffs may have needed to more narrowly tailor the laundry list of acts to which they cite in light of the Court's previous determination of the scope of the underlying fraud, all they must do at this juncture is provide sufficient evidentiary support of the Dwecks' and the Wolfsons' parking and financing.  This they have done.  In his Declaration, Okin asserted that Isaac Dweck and the Wolfsons "received special treatment and various financial benefits from Baron including guaranteed profit, pre-arranged securities trades in exchange for providing capital for the firm and permitting their accounts to be used for parking shares of A.R. Baron 'house stocks.'"  Okin Decl. ¶ 11; *see id.* ¶ 12 ("Bressman had explicit agreements of that type with the Wolfson brothers, . . . and with Isaac R. Dweck . . . and agreed to treat them as 'favored' investors.").[6]  Of course, the Dwecks and the Wolfsons vehemently contest these assertions as to

---

[6] To be sure, there may be a colorable argument that these two paragraphs of the Okin Declaration constitute hearsay, but the Dwecks only moved to strike these excerpts based on a lack of personal knowledge—which proved unavailing at this juncture, as detailed above, *see supra* II.C—and the Wolfsons did not move to strike the Okin Declaration at all.  As made clear by Rule 56(c)(2), the burden of objecting to evidence used on summary judgment falls on the parties.  *See* Fed. R. Civ. P. 56(c)(2) ("*A party* may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." (emphasis added)); *cf. Capobianco v. City of New York*, 422 F.3d 47, 55 (2d Cir. 2005) (holding that district court erred by *sua sponte* excluding evidence on summary judgment in the absence of the parties' objections).

parking, even as they do not appear to contest having invested in Baron-affiliated entities. *See, e.g.*, Dweck Rule 56.1 Stmt. ¶¶ 9 ("Isaac Dweck was promised nothing for his investments in Baron beyond opportunities to invest in private placements, IPOs, and bridge financings."), 14 ("Isaac Dweck was not aware of anything he was doing or permitting Baron to do in his account that assisted Baron's fraud."); Dweck Motion at 14 ("Plaintiffs have no evidence that [Isaac] Dweck was aware that Baron used his accounts to park securities."); Dkt. 405 (Wolfson Rule 56.1 Stmt.) ¶ 24 ("The Wolfsons were not promised anything in connection with their decision to invest capital in the parent company of Baron, the Baron Group."); Dkt. 481-22 at 20 (testimony from Morris Wolfson in which, when asked about the agreements Okin described in the context of a July 1994 meeting with Bressman, he stated that "[t]hat is a complete lie").  However, ultimately these conflicting accounts as to parking or wash trade-type arrangements create a genuine issue of material fact as to substantial assistance.  The task of reconciling these competing views or siding with one over another should fall to the factfinder if there is a trial, not to the Court on summary judgment.

### E.    Actual Knowledge

Even as a genuine dispute of material fact remains as to substantial assistance, Plaintiffs' aiding and abetting fraud claim ultimately fails because they have not succeeded in setting forth specific facts to show a genuine dispute as to actual knowledge.

New York law mandates that "[t]o satisfy the knowledge prong [of an aiding and abetting fraud claim], a plaintiff must demonstrate that the defendant had actual knowledge of the underlying fraud." *Pennington*, 855 F. App'x at 783 (citing *Oster*, 905 N.Y.S.2d at 72). "[E]vidence that a defendant could or should have been able to deduce the fact of an underlying fraud on the basis of red flags or warning signs is not a substitute for actual knowledge."

*Silvercreek Mgmt., Inc. v. Citigroup, Inc*., 346 F. Supp. 3d 473, 487 (S.D.N.Y. 2018).  "But while constructive knowledge alone cannot support a claim for aiding and abetting fraud, circumstantial evidence can be sufficient to support a finding of actual knowledge."  *Id.*; *see also Oster*, 905 N.Y.S.2d at 72 ("Participants in a fraud do not affirmatively declare to the world that they are engaged in the perpetration of a fraud.  The Court of Appeals has stated that an intent to commit fraud is to be divined from surrounding circumstances." (citing *Eurycleia Partners*, 910 N.E.2d 976)).

The Court concludes that Defendants have met their initial burden of demonstrating the absence of a material fact as to their lack of actual knowledge, and Plaintiffs have failed to adduce sufficient circumstantial evidence of actual knowledge to create a genuine dispute.  Even if the Court were to completely disregard Defendants' motions to strike, Plaintiffs purport to show that the Dwecks and the Wolfsons (1) invested in Baron, (2) earned "substantial profits in the house stocks," as Plaintiffs put it, Opposition at 10, (3) engaged in parking and wash sales, and (4) brought in new customers and (in the Wolfsons' case) Bear Stearns as Baron's clearing broker. *See generally id.* at 7-11.  The Okin Declaration also states in relevant part that "[Isaac] Dweck was often in the Baron office and consulted with Bressman about the operation of the firm."  Okin Decl. ¶ 13.

Were the predicate fraud in this action the Baron scheme generally—or even a more narrowly tailored scheme like Baron's "fictitious[] improve[ment]" of its net capital to regulators, Am. Compl. ¶ 131—Plaintiffs may well have created a genuine dispute of material fact through these propositions (assuming they were adequately supported by record evidence).  But the challenge for Plaintiffs is that, as noted above, the fraud in question concerned misrepresentations

to them that they were buying securities at prices that "were represented as set by trading in a market that was falsely represented to exist." 2d Cir. 2015 Opinion, 777 F.3d at 572.

"Marshaling evidence of actual knowledge sufficient to survive summary judgment is not an easy task." *Accent Delight Int'l Ltd. v. Sotheby's*, No. 18 Civ. 9011 (JMF), 2023 WL 2307179, at *19 (S.D.N.Y. Mar. 1, 2023). After exercising its discretion "to conduct an assiduous review of the record," the Court ultimately concludes that Plaintiffs have failed to live up to this task here. *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) (internal quotation marks omitted), *abrogated on unrelated grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009), *as recognized in Moll v. Telesector Res. Grp.*, 94 F.4th 218, 228 (2d Cir. 2024). Courts in the Second Circuit have found that "allegations or evidence that a defendant actively participated in a fraud" or "evidence that a defendant reviewed documents or otherwise had access to information that would have revealed or indicated the fraud" can suffice for such a showing. *Accent Delight Int'l*, 2023 WL 2307179, at *20. Yet Plaintiffs' proffered evidence fits into neither category, nor does it more generally allow a jury to find in Plaintiffs' favor on their claim. The most direct evidence of the Wolfsons' actual knowledge derives from the Securities Investor Protection Corporation ("SIPC") Trustees' report, in which the Trustee—describing his complaint in the adversary proceeding he filed against the Wolfsons in bankruptcy proceedings for Baron—describes the above-referenced July 1994 meeting in which Bressman explained to the Wolfsons that "[c]ustomers who were not insiders would not be given opportunities to buy house stocks cheaply and would not be permitted to sell them at the artificially inflated prices." Dkt. 500 ("Folkenflik Decl."), Exh. E ("Collapse Report") at 152.[7] Disclosing that other Baron customers lacked the

---

[7] As explained in the report, the Securities Investor Protection Act ("SIPA"), 15 U.S.C. § 78aaa *et seq.*, "establishes special procedures designed to protect the customers of a failed

same privileges as the Wolfsons is a far cry from any sort of representation to the Wolfsons that Baron brokers were actively lying to other customers about the way in which they were pricing securities. To the extent that Plaintiffs argue that the Wolfsons should have inferred that Plaintiffs were being deceived from Bressman's description of the scheme, "the Court is not required to make inferential leaps that are unsupported by any evidence in the record." *Gym Door Repairs, Inc. v. Young Equip. Sales, Inc.*, 331 F. Supp. 3d 221, 247 (S.D.N.Y. 2018). Perhaps more importantly, "red flag[s] . . . and probable awareness amount to constructive knowledge, not actual knowledge." *EIG Energy Fund XIV, L.P. v. Keppel Offshore & Marine Ltd.*, No. 18 Civ. 1047 (PGG), 2024 WL 1195575, at *16 (S.D.N.Y. Mar. 20, 2024).

The same defects plague Plaintiffs' best evidence of the Dwecks' (or at least Isaac Dweck's) actual knowledge; namely, the Trustee's allegation in his adversary proceeding complaint against them that Isaac Dweck made cash infusions to Baron amidst a torrent of lawsuits, regulatory investigations, and negative press "suggesting that . . . Baron's principals profited from fraud and other wrongdoing." Folkenflik Decl., Exh. F ¶ 55. As with the Wolfsons, knowledge of investigations or press articles about wrongdoing at Baron generally differs from knowledge about misrepresentations Baron brokers made to Plaintiffs about pricing. Even crediting these allegations as both admissible and true, Defendants' knowledge that Baron was acting improperly

---

broker-dealer in the event of a liquidation." Collapse Report at 2. The SIPC is "a nonprofit corporation consisting of registered broker-dealers and members of national securities exchanges that supports a fund used to advance money to a SIPA trustee." *In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229, 232-33 (2d Cir. 2011) (citing 15 U.S.C. § 78ccc). On July 11, 1996, a SIPC trustee was appointed by a court in this District for the Baron liquidation. *See* Collapse Report at 2. As the Trustee wrote, "a SIPA trustee is responsible for marshalling the assets of the failed broker-dealer (including bringing actions to recover assets taken from the firm) and distributing those assets to satisfy customers and other creditors of the firm." *Id.* at 3. The Trustee filed two related adversary actions against certain members of the Dweck and Wolfson families; per Plaintiffs, both these cases were eventually settled. Opposition at 12-13.

in certain respects does not allow for the inference that Defendants had actual knowledge that Plaintiffs were buying securities at prices that "were represented as set by trading in a market that was falsely represented to exist." 2d Cir. 2015 Opinion, 777 F.3d at 572; *cf. In re Agape Litig.*, 773 F. Supp. 2d 298, 313 (E.D.N.Y. 2011) (granting a motion to dismiss and explaining that the bank defendant's "knowledge that [a brokerage] was acting improperly in one capacity does not raise a strong inference that [the bank] had actual knowledge of the underlying fraudulent scheme" (citing *Lerner*, 459 F.3d at 293)). "Assuming *arguendo* that [Defendants] knew that [Baron was] raising money from investors such as [Plaintiffs], that does not amount to actual knowledge of what [Baron was] telling or not telling [Plaintiffs] in soliciting [their] investment." *EIG Energy Fund XIV*, 2024 WL 1195575, at *16.

Plaintiffs' more indirect evidence fares no better. As for Defendants' participation in parking and wash sale transactions, "[a] party's contribution to atypical financing transactions where that party devised the marketing and financing scheme may provide a circumstantial basis for inferring actual knowledge and substantial assistance when that scheme is subsequently put to fraudulent use by a primary tortfeasor, regardless of whether that party's role itself involved wrongdoing." *Silvercreek Mgmt.*, 346 F. Supp. 3d at 491 (internal quotation marks omitted). But the Second Circuit's interpretation of the Amended Complaint proves fatal here, as well: without "a causal link between any single stock purchase or sale and a corresponding parking by Dweck or coordinated transactions by others," 2d Cir. 2015 Opinion, 777 F.3d at 572, none of these transactions can be said to have been "subsequently put to fraudulent use by a primary tortfeasor" to advance the underlying fraud, *Silvercreek Mgmt.*, 346 F. Supp. 3d at 491.[8]  Isaac Dweck's

---

[8] On that note, Bressman's declaration—to which Plaintiffs cite in their briefing but do not appear to have produced as part of the summary judgment record, *see* Dkt. 516 at 3 n.7—states

allegedly heavy involvement in the Baron enterprise generally is also an insufficient basis to find an inference of actual knowledge in the absence of other indicia of more specific knowledge of the brokerage's dealings with Plaintiffs.  *See, e.g.*, *Wight v. BankAmerica Corp.*, 219 F.3d 79, 92 (2d Cir. 2000) (holding that a complaint sufficiently pleaded aiding and abetting claims when a corporate officer had "personal relationships" with the primary tortfeasors and testified that he was aware of a number of suspicious elements of the at-issue transactions); *Liu Yao-Yi v. Wilmington Tr. Co.*, 301 F. Supp. 3d 403, 420 (W.D.N.Y. Sept. 27, 2017) ("The fact that [one of the primary tortfeasors and an alleged aider and abettor] allegedly spoke to one another on a 'first name basis,' and frequently communicated with one another to do business, simply does not give rise to a strong inference of actual knowledge."); *JP Morgan Chase Bank v. Winnick*, 406 F. Supp. 2d 247, 254 (S.D.N.Y. 2005) (Lynch, J.) ("While [the fact that the alleged aider and abettor was an attorney at a company] does not provide a factual basis for [the attorney's] knowledge of the fraud, the Complaint goes on to reference three emails of which [the attorney] was a recipient . . . [that] contain language which could reasonably be understood to demonstrate [the attorney's] actual knowledge of the true purpose of the swaps.").

Plaintiffs' final salvo is that a jury could "[d]raw[] an inference of knowledge from [Defendants'] profits."  Opposition at 40.  While that might be true in some cases, it is unclear why that would be the case here.  Viewing the sum total of Plaintiffs' mustered evidence in light most favorable to them, the Dwecks and the Wolfsons knew they were profiting off a scheme in

---

that the Wolfsons' parking of the House Stocks "help[ed Bressman] to support the prices" thereof. Dkt. 449-8 ¶ 3.  But this statement does not evince any explanation by Bressman to the Wolfsons about the impact of their parking on the House Stock prices; indeed, Bressman appears to describe "the nature of th[e] arrangement" that he explained to the Wolfsons as "receiv[ing] special treatment and pre-arranged securities trades in exchange for providing capital to the firm and permitting their accounts to be used for parking shares of A.R. Baron 'house stocks.'"  *Id.*

which they received advantages not available to other customers that—per press reports or the like—was fraudulent in some capacity. While it likely would be fair to say that the Dwecks and the Wolfsons should or could have known that there were victimized customers on the other side of the ledger, there is no indication, circumstantial or otherwise, that these Defendants were aware of how Baron defrauded these customers through pricing-related misrepresentations about the House Stocks.

In sum, an inference of actual knowledge of general fraud simply will not suffice, *see Rosner v. Bank of China*, 349 F. App'x 637, 639 (2d Cir. 2009) ("Even if [the alleged aider and abettor] had reason to suspect that [the primary tortfeasor] was laundering money, this does not mean that [the former] had actual knowledge of the fraudulent scheme perpetrated by [the latter]."), nor will an inference that the Dwecks and the Wolfsons possessed sufficient "information that would cause a person exercising reasonable care and diligence to become aware of the fraud," *EIG Energy Fund XIV*, 2024 WL 1195575, at *13 (internal quotation marks omitted). Yet that is all Plaintiffs have mustered here. Without sufficient evidence to create a genuine issue of material fact as to actual knowledge, Plaintiffs' aiding and abetting fraud claim cannot survive.

### III.  Conclusion

For the foregoing reasons, Defendants' motions for summary judgment are granted.  To the extent not discussed above, Defendants' motions to strike are denied as moot.[9]  The Clerk of Court is respectfully directed to terminate the motions pending at Docket Numbers 474, 478, 509, 513, 528, and 529, to close this case, and to enter judgment.

SO ORDERED.

Dated:  August 13, 2024
      New York, New York

_____
JOHN P. CRONAN
United States District Judge

---

[9] At one point in their Opposition, which was filed over nine months ago, Plaintiffs indicated that they intended to seek leave to amend to add (or reinstate) their action for civil conspiracy "in light of the evidence of an explicit conspiratorial agreement submitted on this [m]otion."  Opposition at 34.  The Court sees no need to act on this request, given that Plaintiffs have not since filed this contemplated motion.